PUBLIC SERVICE COMPANY OF COLORADO and Western Slope Gas Company, Appellants,

v.

The PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO, Edythe S. Miller, Sanders G. Arnold and Daniel E. Muse, Commissioners, Greeley Gas Company, Citizens Utilities Company, Kansas-Nebraska Natural Gas Company, Rocky Mountain Natural Gas Co., Inc., Gas Research Institute, Peoples Natural Gas Division of Northern Natural Gas Company, Colorado Interstate Gas Company, Salida Gas Service Company, Ann Caldwell and City of Colorado Springs, Colorado, Appellees.

No. 80SA286.

Supreme Court of Colorado, En Banc.

April 26, 1982.

Kelly, Stansfield & O'Donnell, James R. McCotter, Denver, for appellants.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Eugene C. Cavaliere, Asst. Atty. Gen., Denver, for appellees.

ERICKSON, Justice.

The issue on appeal is whether the Public Utilities Commission acted arbitrarily and capriciously in denying the appellants' request to pass on to its customers an increase in the cost of natural gas obtained from interstate suppliers. The increase resulted from a decision of the Federal Energy Regulatory Commission which authorized interstate natural gas companies to raise their tariffs to fund a national program for natural gas research and development. We affirm.

## I.

The appellants, Public Service Company of Colorado (Public Service) and Western Slope Gas Company (Western Slope), are public utilities subject to the jurisdiction of the appellee, Public Utilities Commission of the State of Colorado (PUC). Both Public Service and Western Slope are engaged, *inter alia*, in the purchase and sale of natural gas. Public Service receives approximately 76% of its total natural gas supply from Colorado Interstate Gas Company (CIG) and the remaining 24% from Western Slope. Western Slope, in turn, receives approximately 73% of its total gas supply from CIG, about 27% from various producers within Colorado, and a small percentage (less than 1%) from Northwest Pipeline Corporation (NPC). Both CIG and NPC are interstate gas suppliers subject to regulation by the Federal Energy Regulatory Commission (FERC).[1]

Due to the rapidly escalating cost of purchasing natural gas in recent years, the PUC has permitted Public Service and Western Slope to include in their tariffs provisions known as a "gas cost adjustment" or a "purchased gas adjustment."[2] The adjustment provisions allow Public Service and Western Slope to promptly pass on to their customers, as a "flow-through" charge, certain wholesale increases in the price of natural gas charged by their respective suppliers. *See Peoples Natural Gas v. Public Utilities Commission*, 197 Colo. 152, 590 P.2d 960 (1979). The total amount of the adjustment is directly related to a consumer's natural gas consumption measured in hundred cubic feet. Although increases and changes in the amount of the gas cost adjustment must be approved monthly by the PUC, the approval process is outside the scope of general utility rate increase proceedings. *See Peoples Natural Gas v. Public Utilities Commission, supra.*

In 1976, after a study conducted by the American Gas Association and the Interstate Natural Gas Association of America, the Gas Research Institute (GRI) was incorporated as a nonprofit organization in order to establish a national program of natural gas related research and development. GRI is the principal management organization for cooperative research and development in the gas service industry, and was organized exclusively for scientific and educational purposes. Its role is to complement and enlarge the scope of the research and development work of individual gas service companies. GRI is not a formal research laboratory. Its projects are carried out through contracts with laboratories, universities,

1. CIG and NPC are regulated by FERC pursuant to the Natural Gas Act, 15 U.S.C. § 717 *et seq.* (1976), which applies to "the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption . . . , and to natural-gas companies engaged in such transportation or sale. . . ." *Id.* at § 717(b). The Federal Power Commission was initially charged with the regulation of the transportation and sale of natural gas in interstate commerce. Effective October 1, 1977, however, the Federal Power Commission ceased to exist and its functions and regulatory responsibilities were transferred to the Secretary of Energy and the Federal Energy Regulatory Commis-

sion (FERC) which, as an independent commission within the Department of Energy, was activated on the same date. *See* Department of Energy Organization Act, Public Law 95–91, 91 Stat. 565 (August 4, 1977); 42 U.S.C. § 7172 (1976).

2. The Public Utilities Commission has authority to permit cost adjustments such as the gas cost adjustment as part of its wide discretion to govern and regulate the rates of public utilities in this state. *See* section 40–3–102, C.R.S. 1973; *Colorado Ute Electric Association v. Public Utilities Commission*, 198 Colo. 534, 602 P.2d 861 (1979).

and other organizations which perform research and development work for outside sponsors. GRI is also not a natural gas company engaged in the business of production, transmission, or distribution of natural gas within the meaning of the Natural Gas Act, 15 U.S.C. § 717 et seq., or a public utility within the meaning of section 40–1–103, C.R.S. 1973. Accordingly, GRI is not subject to the jurisdiction of either FERC or the PUC.[3]

The membership of GRI represents a great majority of interstate pipeline companies and a large segment of the national natural gas distribution industry.[4] In order to provide the bulk of its funding, GRI proposed to charge an increment on each thousand cubic feet (mcf) of natural gas transported in interstate commerce subject to FERC jurisdiction and, to the extent possible, a similar increment on natural gas transported in intrastate commerce. GRI

presented its proposal to FERC and, on March 22, 1978, FERC approved the proposal following lengthy consideration. See Opinion No. 11, Docket No. RM77–14, Federal Energy Regulatory Commission (March 22, 1978). In its order, FERC authorized the interstate pipeline members of GRI, including CIG and NPC[5], to include a GRI adjustment in their FERC tariffs, which consequently increased the natural gas rates charged to their customers by that amount.[6]

On April 6, 1978, CIG filed with FERC the necessary tariff revisions to raise the costs of its natural gas to reflect the GRI charge. Subsequently, Public Service and Western Slope filed applications with the PUC to pass on to their customers the increased natural gas costs, as reflected by the GRI adjustment charge, pursuant to their respective gas cost adjustments.[7] On

---

3. The research and development (R&D) concept of GRI was, however, endorsed by the Federal Power Commission (the predecessor to FERC) in 1976:

"We are encouraged by the increased emphasis R&D has been given by some elements of the electric power and natural gas industries as demonstrated by the support given to the Electric Power Research Institute by jurisdictional electric power companies and by a number of requests for advanced approval of individual R&D projects by jurisdictional natural gas companies. However, we have not yet seen the level of concentrated and coordinated effort by the natural gas industry that the public interest requires to significantly advance the state of technology to relieve the severe curtailment of service now being experienced by interstate natural gas pipelines...." Notice of Proposed Rulemaking for Advance Approval of Rate Treatment for Research and Development, Federal Power Commission Docket No. RM76–17 (June 17, 1976).

4. Membership in GRI is limited to interstate gas pipeline companies, investor-owned gas distribution utility companies, intrastate gas pipeline companies, and municipal or other government or publicly owned gas distribution utility systems. CIG, NPC, Public Service, and Western Slope are all members of GRI.

5. Since CIG is the principal interstate gas supplier for the purposes of this appeal, our subsequent references in this decision to CIG will also include NPC to the extent that it supplies a small portion of Western Slope's natural gas supply.

6. In order to fund the 1978 GRI program, FERC authorized the interstate pipeline companies which were members of GRI to increase the rates charged to their customers by 1.2 mills ($0.0012) per mcf. Subsequently, FERC authorized an increase in the GRI charge to 3.5 mills per mcf to fund the 1979 GRI program. On October 2, 1979, after the proceedings in this case were initiated, FERC established a charge of 4.8 mills per mcf in order to fund the 1980 GRI program. The amount of subsequent increases in the charges authorized by FERC to fund the GRI program after 1980 are not part of the record before us on appeal.

7. The applications of Public Service and Western Slope were also consolidated with similar applications filed by Greeley Gas Company and Citizens Utilities Company. However, neither Greeley Gas Company nor Citizens Utilities Company is a party to this appeal. We therefore do not address their applications in this decision. In their original applications to the PUC dated May 11, 1978, Public Service and Western Slope requested that their respective gas cost adjustments be increased by 1.2 mills per mcf. Subsequently, Public Service and Western Slope filed amendments to their applications, requesting permission to increase the amount of their respective gas cost adjustments by 3.5 mills per mcf, to reflect the GRI charge for 1979 authorized by FERC. See note 6, supra. At 3.5 mills per mcf, the total amount of the 1979 GRI adjustment charge billed to Public Service and Western Slope was $759,278.00.

December 28, 1978, FERC approved CIG's proposal to amend its tariffs to reflect the GRI adjustment charge. Since January 1, 1979, both Public Service and Western Slope have been billed for and have paid the GRI charges to CIG.

The PUC consolidated Public Service's and Western Slope's applications and set them for hearings on March 7 and 8, 1979. On June 14, 1979, the PUC denied both applications in their entirety. The PUC conceded that it was legally obligated to consider the GRI charge made by interstate pipeline companies as a reasonably incurred operating expense for ratemaking purposes, but determined that it was not required to flow through to natural gas consumers the GRI charge as part of Public Service's or Western Slope's gas cost adjustment. Accordingly, the PUC concluded that the GRI charges incurred in connection with the natural gas purchases from CIG should be considered only as a cost of service item in future general rate proceedings for each company. *Public Utilities Commission Decision* No. C79–907 (June 14, 1979). Commissioner Arnold dissented from that portion of the PUC decision which disallowed the flow-through to consumers of the GRI charge for interstate natural gas.[8] In his view, it is "patently unfair not to allow the Applicants, with respect to the increased interstate cost of gas which has been specifically sanctioned by a federal regulatory body, to recover that increased cost of gas in the same manner as we allow utilities to cover other increased costs of gas."

Public Service and Western Slope thereafter filed a timely joint application for rehearing. Since the PUC did not act on the application within thirty days, it was denied by operation of law.[9] Public Service and Western Slope then commenced an action for judicial review pursuant to section 40–6–115(1), C.R.S. 1973 (1981 Supp.). In a minute order issued on April 15, 1980, the district court affirmed the PUC decision. Public Service and Western Slope thereafter appealed and, for the reasons set forth in this opinion, we affirm the decision of the district court.

## II.

In 1938, the Natural Gas Act, 15 U.S.C. § 717 *et seq.* (1976) (Act), extended federal regulatory power to "the transportation of natural gas and the sale thereof in interstate and foreign commerce...." *Id.* at § 717(b). The reach of federal jurisdiction under the Natural Gas Act is a constitutional exercise of federal power under the commerce clause of the United States Constitution. *U.S.Const.* art. I, § 8. *See Fed-*

---

8. As a member of GRI, Western Slope is obligated to remit the same increment per mcf of intrastate volumes as the interstate pipeline members must remit for the volumes they transport. However, pursuant to GRI bylaws, the obligation of Western Slope ripens only following regulatory approval of a flow-through to consumers. Accordingly, Public Service and Western Slope also sought authorization from PUC to pass on to their customers the similar increments attributable to Western Slope's purchases from its intrastate suppliers. The PUC was unanimous in denying the applications for flow-through of the GRI charges based on intrastate natural gas. On appeal, Public Service and Western Slope do not challenge the denial of the flow-through of GRI charges on the intrastate volumes of natural gas. We therefore limit our discussion in this decision to whether the PUC's denial of Public Service's and Western Slope's applications regarding the interstate volumes of natural gas from CIG was proper.

9. Section 40–6–114(1), C.R.S. 1973, provides:

"After a decision has been made by the commission or after a decision recommended by an individual commissioner or examiner has become the decision of the commission, as provided in this article, any party thereto may within twenty days thereafter, or within such additional time as the commission may authorize upon request made within such period, make application for rehearing, reargument, or reconsideration of the same or of any matter determined therein. Such application shall be governed by such general rules as the commission may establish and shall specify with particularity the grounds upon which the applicant considers the decision unlawful. *Any such application shall, within thirty days after the filing thereof, be considered and acted upon by the commission. Failure to act upon the application within such period shall constitute a denial thereof.* Rehearing, reargument, or reconsideration may be granted if sufficient reason therefor is shown." (Emphasis added.)

*eral Power Commission v. Natural Gas Pipeline Company,* 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942). As a result, the Act preempted the authority of state commissions to regulate the rates charged for natural gas by interstate pipeline companies. *See U.S.Const.* art. VI. *See also Narragansett Electric Co. v. Burke,* R.I., 381 A.2d 1358 (1977); *cert. denied,* 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978).

The United States Supreme Court has noted that, consistent with the objectives of the Act, its legislative history evidences an intent to establish a federal agency to regulate the transportation and sale of natural gas by interstate pipeline companies:

> "An avowed purpose of the Natural Gas Act of June 21, 1938, was to afford, through the exercise of the national power over interstate commerce, an agency for regulating the wholesale distribution to public service companies of natural gas moving interstate, which this Court had declared to be interstate commerce not subject to certain types of state regulation.... By its enactment Congress undertook to regulate a defined class of natural gas distribution without the necessity, where Congress has not acted, of drawing the precise line between state and federal power by the litigation of particular cases." *Illinois Natural Gas Company v. Central Illinois Public Service Company,* 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371 (1942).

Pursuant to the Natural Gas Act, the Federal Power Commission (the predecessor of FERC) was established and was vested with the authority to regulate "the interstate transportation and the sale of gas at wholesale to local distributing companies." 314 U.S. at 506–07, 62 S.Ct. at 387–388.

■ There has been no retreat from the principle that the federal regulatory scheme for interstate natural gas prices is not subject to interference by state authorities:

> "The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, ... or for state regulations which would indirectly achieve the same

result. [Such] state orders · necessarily deal with matters which directly affect the ability of the Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act. They therefore invalidly invade the federal agency's exclusive domain." (Citation and footnote omitted.) *Northern Natural Gas Company v. State Corporation Commission of Kansas,* 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963).

Thus, since the regulation of the rates at which CIG sells natural gas to local distribution companies such as Public Service and Western Slope is vested exclusively in FERC, the PUC is preempted from directly or indirectly regulating CIG's rates for natural gas. However, since the states retained authority under the Act to regulate sales of natural gas at "local retail rates to the ultimate consumers," the result is a blend of federal-state regulation, each with exclusive authority in its respective field. *Illinois Natural Gas Company v. Central Illinois Public Service Company, supra.* See *also* 15 U.S.C. § 717(c) (1976); *Narragansett Electric Company, supra; Federal Power Commission v. Southern California Edison Company,* 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964).

The PUC is the administrative agency charged with the duty of regulating the intrastate rates of public utilities within the State of Colorado. Section 40–3–102, C.R.S. 1973. *See also Colo.Const.* Art. XXV. *See generally Colorado Ute Electric Association v. Public Utilities Commission,* 198 Colo. 534, 602 P.2d 861 (1979); *Denver Welfare Rights v. Public Utilities Commission,* 190 Colo. 329, 547 P.2d 239 (1976); *Consolidated Freightways Corps. v. Public Utilities Commission,* 158 Colo. 239, 406 P.2d 83 (1965). The PUC is authorized by statute to conduct hearings to investigate the propriety of proposed rate changes and to make such orders with regard to a proposed rate as may be just and reasonable. Section 40–3–101, C.R.S. 1973, provides:

"(1) All charges made, demanded, or received by any public utility for any rate, fare, product, or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge made, demanded, or received for such rate, fare, product or commodity, or service is prohibited and declared unlawful.

"(2) Every public utility shall furnish, provide, and maintain such service, instrumentalities, equipment, and facilities as shall promote the safety, health, comfort, and convenience of its patrons, employees, and the public, and as shall in all respects be adequate, efficient, just, and reasonable."

*See also* section 40–3–111, C.R.S. 1973.

 The fixing of "just and reasonable" rates involves a balancing of investor and consumer interests. *Federal Power Commission v. Hope Natural Gas Company*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). In *Public Utilities Commission v. District Court*, 186 Colo. 278, 527 P.2d 233 (1974), we held:

"Under our statutory scheme, the PUC is charged with protecting the interest of the general public from excessive, burdensome rates. The PUC must determine that every rate is 'just and reasonable' and that services provided 'promote the safety, health, comfort and convenience of its patrons, employees, and the public and shall in all respects be adequate, efficient, just and reasonable.' C.R.S. 1963, 115–3–1. The PUC must also consider the reasonableness and fairness of rates so far as the public utility is concerned. It must have adequate revenues for operating expenses and to cover the capital costs of doing business. The revenues must be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." 186 Colo. at 282–83, 527 P.2d 233.

The PUC must therefore set rates which protect both: (1) the right of the public utility company and its investors to earn a return reasonably sufficient to maintain the utility's financial integrity; and (2) the right of consumers to pay a rate which accurately reflects the cost of service rendered. *See also Peoples Natural Gas v. Public Utilities Commission*, 193 Colo. 421, 567 P.2d 377 (1977); *Mountain States Telephone & Telegraph v. Public Utilities Commission*, 182 Colo. 269, 513 P.2d 721 (1973); *Public Utilities Commission v. Northwest Water Corp.*, 168 Colo. 154, 451 P.2d 266 (1969); *Consolidated Freightways Corps. v. Public Utilities Commission, supra.*

 Among the factual findings which the PUC must make in carrying out its ratemaking function is a determination of the operating expenses of the utility. *See Public Utilities Commission v. District Court, supra. See generally* section 40–6–115, C.R.S. 1973. A major operating expense which the PUC must necessarily consider in arriving at a just and reasonable rate is the cost which Public Service and Western Slope must pay to acquire natural gas from their suppliers. Where the rate or acquisition cost is subject to federal regulation and authorized by a federal regulatory agency, however, the PUC may not question its reasonableness. In *Montana-Dakota Utilities Company v. Northwestern Public Service Company*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), the United States Supreme Court stated:

"We hold that the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." 341 U.S. at 251–52, 71 S.Ct. at 695.

Under the "filed-rate doctrine" established in *Montana-Dakota Utilities Company, supra*, neither the PUC nor the courts can unilaterally establish a different rate for natural gas because they are of the opinion that the FERC-approved tariff is unfair or unreasonable. *See Narragansett Electric Company v. Burke*, R.I., 381 A.2d 1358 (1977).

■ Under the facts of this case, the jurisdiction to determine the reasonableness of the interstate wholesale rate charged by CIG to Public Service and Western Slope therefore rests exclusively with FERC. If Public Service and Western Slope wish to receive natural gas from CIG, they have no choice but to pay CIG's FERC-approved tariffs to receive their supply. Moreover, it is undisputed that the GRI adjustment charge is part of the tariff which FERC has authorized CIG to charge its customers. Accordingly, we conclude that the GRI charge is an added cost of natural gas which the PUC is legally obligated to consider as a reasonable operating expense of Public Service and Western Slope. *See, e.g., Narragansett Electric Company, supra; United Gas Corp. v. Mississippi Public Service Commission*, 240 Miss. 405, 127 So.2d 404 (1961); *City of Chicago v. Illinois Commerce Commission*, 13 Ill.2d 607, 150 N.E.2d 776 (1958); *Citizens Gas Users Association v. Public Utilities Commission*, 165 Ohio St. 536, 138 N.E.2d 383 (1956).

### III.

Public Service and Western Slope contend that the PUC abused its discretion and acted arbitrarily and capriciously in denying their applications to flow through the GRI charges on natural gas, via their respective gas cost adjustments, directly from CIG to Colorado consumers. We disagree.

■ The PUC is vested with considerable discretion in carrying out its legislative functions and, under section 40–6–115, C.R.S. 1973, the scope of judicial review of PUC decisions is limited. Section 40–6–115(3) provides:

"(3) Upon review, the district court shall enter judgment either affirming, setting aside, or modifying the decision of the commission. So far as necessary to the decision and where presented, the district court shall decide all relevant questions of law and interpret all relevant constitutional and statutory provisions. The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence."

*See also Colorado Municipal League v. Public Utilities Commission*, 198 Colo. 217, 597 P.2d 586 (1979).

Under the circumstances of this case, the PUC has not violated any provisions of the United States or Colorado Constitutions, and has not acted unjustly or in an arbitrary or capricious manner. *Cf. Mountain States Legal Foundation v. Public Utilities Commission*, 197 Colo. 56, 590 P.2d 495 (1979); *Colorado Municipal League v. Public Utilities Commission*, 197 Colo. 106, 591 P.2d 577 (1979). *See generally Montrose v. Public Utilities Commission*, 197 Colo. 119, 590 P.2d 502 (1979). As we discussed in part II of this opinion, it is within the purview of the PUC to set just and reasonable rates for the purchase of natural gas by consumers in Colorado from local distributing companies. In *Public Utilities Commission v. Northwest Water Corp.*, 168 Colo. 154, 451 P.2d 266 (1969), we declared:

"The court, unless clearly and unequivocally empowered by legislative mandate, should not invade areas of legislative discretion primarily left to the Commission by entering an order which it deems the Commission *ought* to have made .... The framework of the legislative act creating the Commission and providing for the rate-making procedures clearly indicates that rate-making in Colorado has been delegated to the Commission and not the courts." (Emphasis in original.) 168 Colo. at 168–69, 451 P.2d 266.

*See also Montrose v. Public Utilities Commission*, Colo., 629 P.2d 619 (1981); *Mountain States Telephone & Telegraph v. Public Utilities*, 176 Colo. 457, 491 P.2d 582 (1971); *Colorado Municipal League v. Public Utilities Commission*, 172 Colo. 188, 473 P.2d 960 (1970).

We do not agree with the statement of Public Service and Western Slope that the PUC is legally obligated to flow through the GRI charge to natural gas consumers as part of the gas cost adjustments. Commissioner Arnold, in dissenting in part from the PUC decision, expressly declined to decide whether the position of Public Service and Western Slope was legally correct, but concluded that the PUC was "remiss" in not allowing the flow-through in this case. We do not believe that the PUC action, however characterized, was an abuse of its discretionary authority in this case. In our view, although the PUC is legally obligated to consider the GRI charge as a reasonable operating expense of Public Service and Western Slope, our decision does not mandate that the PUC must include the GRI charge as a flow-through item. In its decision, the PUC recognized its legal obligation:

"Applicants, Western Slope, Public Service and GRI have argued to this Commission that under the 'filed rate doctrine,' this Commission must consider the GRI charge as a 'reasonably' incurred operating expense.... The Commission agrees with Applicants and GRI that this Commission legally is required to consider the GRI charge flowed through from CIG and Northwest Pipeline Corporation to Colorado distribution companies as a 'reasonably' incurred operating expense for ratemaking purposes."

We believe that the manner in which a gas adjustment clause is treated is an administrative matter where there is broad latitude for sound discretion. *Accord, Narragansett Electric Company v. Burke,* R.I., 381 A.2d 1358 (1977). It is clear that the PUC, under the gas cost adjustment provisions, may choose to adjust Public Service's and Western Slope's existing retail rates to reflect the increased cost of interstate natural gas, though it need not do so. Since the PUC has established the gas cost adjustment provisions pursuant to its broad regulatory authority under section 40–3–102, C.R.S. 1973, we cannot preclude the PUC from including, modifying, or suspending the particular charges passed on to the consumers by the cost adjustment provisions. In *Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 176 Pa.Super. 568, 107 A.2d 745 (1954), the court held:

"The operation of the [gas adjustment] clause, like most questions dealing with the refinements of rate structures, is primarily a factual matter for determination by the Commission. The mere fact that the type of clause advocated by Duquesne formerly found approval does not preclude the Commission from changing it in the exercise of its functions as an administrative agency of the legislature. Rate making is an exercise of the legislative power, delegated to the Commission, and necessarily implies a range of legislative discretion." (Citations omitted.) 107 A.2d at 755.

*See also City of Chicago v. Illinois Commerce Commission,* 13 Ill.2d 607, 150 N.E.2d 776 (1958).

We therefore conclude that the PUC may treat the GRI charge as it treats other filings for proposed rate increases in general rate proceedings. In doing so, it is able to fully investigate whether Public Service or Western Slope has experienced savings in other areas which might offset the increased price for natural gas to consumers. The PUC does not abuse its discretion when it conducts such an investigation in order to balance the interests of the utility investors and the ultimate consumers in arriving at a just and reasonable rate for natural gas.[10]

10. Our decision today is limited to a consideration of whether the PUC abused its discretion in disallowing the GRI charge as a flow-through item in Public Service's and Western Slope's respective gas cost adjustment provisions. We do not comment upon the GRI charge as approved by FERC. We do note, however, that the PUC was critical of the GRI funding process under which the end users of natural gas, *i.e.,* the consumers, provide 100% of GRI's research and development budget without any concomitant voting control over its expenditures. Conversely, the natural gas utility members of GRI, which provide none of the funding for GRI's research and development, exercise voting control over all the research and development expenditures. *See*

We emphasize by way of limitation that this is not a case where the PUC has denied Public Service or Western Slope their right to have the GRI charges included as reasonable operating expenses in a general rate proceeding to increase the rates of natural gas to consumers.[11] We would not condone PUC action which denies local distributing companies a fair return on the "investments they necessarily incur in servicing their customers while simultaneously incurring the increased producer prices." *Cities Service Gas Company v. Federal Energy Regulatory Commission*, 627 F.2d 1027 (10th Cir. 1980). Under the circumstances of this case, we decline to order the PUC to automatically adjust the retail rates for natural gas in this state to reflect the GRI adjustment charges billed to Public Service and Western Slope. So long as the PUC considers the GRI adjustment charge as a reasonably incurred operating expense of a local distribution company, as it is legally required to do, its decision to refrain from automatically passing such charges on to the ultimate consumers falls within its administrative discretion.

Accordingly, for the reasons expressed in this opinion, the judgment of the district court is affirmed.

*Public Utilities Commission Decision*, No. C79–907 (June 14, 1979).

Because of its dislike of the present funding of the GRI program, the PUC appealed FERC's opinion and order approving GRI's 1980 research and development program and related five-year plan for 1980–1984. (FERC Opinion No. 64, Docket No. RP79–75 (October 2, 1979)). The District of Columbia Circuit Court of Appeals affirmed the decision of FERC, and held that: (1) FERC had authority to accept and rule on the rate increase application submitted by GRI on behalf of its jurisdictional members, and was not required to process applications on an individual basis; (2) FERC could take into account nonjurisdictional activities when setting just and reasonable rates; and (3) FERC did not act beyond its jurisdiction in approving the expenditure of funds by GRI in areas which had as their broad goal the conservation of dwindling gas supplies. *Public Utilities Commission v. Federal Energy Regulatory Commission*, 660 F.2d 821 (D.C.Cir.1981).

11. In Public Service's next general rate increase proceeding after its application to flow through the GRI charge was denied, the PUC allowed a 3.5 mill per mcf GRI charge as a reasonably incurred operating expense. *See Public Utilities Commission Decision* No. C80–130, Investigation and Suspension Docket No. 1330 (January 22, 1980).