**ARKANSAS POWER & LIGHT COMPANY, Appellee,**

v.

**MISSOURI PUBLIC SERVICE COMMISSION, William Steinmeier, Charlotte Musgrave, Allen G. Mueller, Connie B. Hendren, James Fischer, Office of Public Counsel, St. Joe Mineral Corporation, Ozark Lead Company, Cominco American Corporation, and GAF Corporation, Appellants.**

Nos. 86–2254, 86–2255 and 86–2284.

United States Court of Appeals, Eighth Circuit.

Submitted April 16, 1987.

Decided Sept. 30, 1987.

---

William C. Harrelson, Jefferson City, Mo., for appellants.

Michael G. Thompson, Little Rock, Ark., for appellee.

Before ARNOLD and WOLLMAN, Circuit Judges, and BOGUE,* Senior District Judge.

ARNOLD, Circuit Judge.

The question presented is whether a federally ordered wholesale electric rate must be immediately passed on to a utility's retail customers, despite state laws providing for a period of suspension before retail rates may become effective. The parties agree that costs represented by federally imposed wholesale rates must eventually be recognized by state retail-rate-making

* The Hon. Andrew W. Bogue, Senior United States District Judge for the District of South Dakota, sitting by designation.

authorities. Their disagreement comes only on the question whether the federally ordered costs must, as a matter of federal law, be passed on at once, as opposed to being considered as one element in a rate case handled in accordance with ordinary state-law procedures. The District Court ordered state authorities to authorize an immediate pass-through of the federally ordered costs. We hold that the District Court had jurisdiction and properly chose to exercise it. But on the merits, we reverse. State rate-making authorities are free to take account of federally ordered costs in accordance with procedures customarily used for ordinary rate cases. We emphasize that our holding relates only to interim procedures, routinely applied by state authorities to all rate proceedings. We desire to leave no implication that permanent retail-rate decisions may disregard, in whole or in part, costs lawfully imposed by federal authority.

## I.

Arkansas Power & Light Company (AP & L) is an electric utility serving customers in parts of Arkansas, Missouri, Louisiana, and Tennessee. This case directly concerns only its Missouri business, about 4% of AP & L's sales. AP & L is a wholly owned subsidiary of Middle South Utilities, Inc. (MSU), which also owns three other operating subsidiaries, Louisiana Power & Light Company (LP & L), Mississippi Power & Light Company (MP & L), and New Orleans Public Service Company, Inc. (NOPSI). MSU and its four electric-utility subsidiaries are parties to an agreement under which another MSU subsidiary, Middle South Energy, Inc. (MSE), built and now operates a nuclear generating plant at Port Gibson, Mississippi, known as Grand Gulf Unit 1. Grand Gulf 1 is the largest nuclear reactor ever licensed for commercial operation in this country. III Appellants' Appendix (App.) 536. MSE owns 90% of this plant.[1]

AP & L, LP & L, MP & L, NOPSI, and MSU signed an agreement, called the Unit Power Sales Agreement (UPSA) specifying the respective responsibilities of the four operating companies to pay for the generating capacity of Grand Gulf 1. Under the UPSA, LP & L, MP & L, and NOPSI were all assigned percentages of this cost, but it was agreed that AP & L, which had older and more economical nuclear power plants of its own, would not have to pay for any of Grand Gulf 1. The Federal Energy Regulatory Commission (FERC) found the UPSA unjustly discriminatory and substituted a cost-allocation scheme of its own in place of the parties' contract. *Middle South Energy, Inc.*, 31 FERC ¶ 61,305, *modified on rehearing*, 32 FERC ¶ 61,425 (1986).[2] Under the FERC order, AP & L must pay 36% of MSE's 90% share of Grand Gulf 1's costs, as well as 36% of the other nuclear-capacity costs of the Middle South system.

This case concerns the retail-rate consequences in Missouri of the FERC order. Grand Gulf 1 began operating on July 1, 1985, and at that time, because of the FERC order, AP & L had to begin (and did

1. The other 10% has been sold to South Mississippi Electric Power Association.

2. For purposes of this appeal, we have taken the FERC order reforming the UPSA as a given. Various parties before FERC, including AP & L and the defendant Missouri Public Service Commission, sought review of the order in the United States Court of Appeals for the District of Columbia Circuit. That court initially affirmed the FERC order. *Mississippi Indus. v. FERC,* 808 F.2d 1525 (D.C.Cir.1987) (per curiam), *petition for cert. filed,* 55 U.S.L. Week 3608 (U.S. Feb. 20, 1987) (No. 86–1380). On April 3, 1987, the D.C. Circuit granted rehearing en banc on the petition of the City of New Orleans and others. Parts of the portion of the panel opinion dealing with the allocation of nuclear-capacity costs among MSU's four operating electric-utility companies were vacated. *Mississippi Indus. v. FERC,* 814 F.2d 773 (D.C.Cir.1987). On June 24, 1987, acting on its own motion, the D.C. Circuit *en banc* reconsidered the petition for rehearing, vacated its previous order, and denied rehearing *en banc.* 822 F.2d 1103. On the same day, the panel which had originally decided the case granted rehearing, reversed the FERC, and remanded the case to that body for further consideration of the allocation of costs. *Id.* at 1104. So the case is again before FERC. As of this writing, FERC has taken no action on remand, but its order appears to remain in effect, at least *de facto.* Whether that order is lawful and valid is not a question before us.

begin) paying on the order of 33 million dollars a month to MSE. At the time, AP & L estimated that about one million dollars a month of this payment was properly allocable to Missouri. The company promptly applied to the Missouri Public Service Commission (MPSC) for a retail rate increase of $17,178,000, about 12 million dollars of which reflected its share of Grand Gulf. (Under Section 201 of the Federal Power Act, 16 U.S.C. § 824 (1982), FERC regulates the rates of wholesale sales in interstate commerce, while state authorities are left free to regulate retail rates.) Missouri law provides that rates filed by electric utilities with MPSC will go into effect unless suspended by the Commission. The Commission may suspend rates for up to ten months. Mo.Rev.Stat. § 393.150 (1978). If it does not rule on the rate request before the end of the suspension period (a time known as the "operation-of-law date"), the rates go into effect as filed.

In this case, MPSC did suspend AP & L's requested rate increase. It set May 4, 1986, as the operation-of-law date, stating it needed "sufficient time to study the effect of the proposed tariffs and to determine if they are just, reasonable and in the interest of the public." *In re Arkansas Power & Light Co.*, No. ER–85–265 (Mo.P. S.C. July 3, 1985), III App. 551. Missouri law provides for interim rate relief in the event of a financial emergency, and AP & L did apply for this relief, but it was denied on January 14, 1986. *In re Arkansas Power & Light Co.*, No. ER–86–52. The Commission found that AP & L had not met the usual state-law standards of financial hardship (and AP & L does not now contest this finding).

About 20 days later, and while the permanent rate case was still pending, AP & L filed this suit in the District Court. It claimed that MPSC's failure to allow it to begin collecting Grand Gulf 1 costs immediately from its Missouri retail customers conflicted with the Federal Power Act (FPA). That Act gives FERC the sole power to fix wholesale rates and decide the reasonableness of contracts affecting wholesale rates. Such rates, when fixed by FERC, of course become a cost to the operating company which has bought energy at wholesale in interstate commerce and wishes to sell it at retail in intrastate commerce. If a state commission, in setting retail rates, declines to acknowledge this cost, refuses to allow it to be passed through to retail customers, then, according to the theory of AP & L's complaint, it is violating the FPA, because it is denying effect to a FERC order fixing the cost of power purchased in interstate commerce. MPSC did not contest the general validity of this theory. It agreed that it could not change the federally ordered rates, that they had to be passed on to retail customers, that it was "stuck with" the rates and charges set by FERC, III App. 637 (oral argument before the District Court), subject, of course, to its right, as a party before FERC, to seek direct judicial review of that agency's order. MPSC maintained, however, that federal law did not mandate the time at which, or the manner in which, FERC-ordered costs had to be passed through. The statutory suspension procedure, an ordinary incident of rate-making under state law, was not preempted, it said. So long as the FERC-set rates were ultimately passed through, states remained free to treat this rate case like any other.

The District Court held for AP & L. It found the Johnson Act, 28 U.S.C. § 1342 (1982), which we discuss later, no bar to its jurisdiction, and it also rejected MPSC's argument that as a matter of discretion it should abstain from exercising its jurisdiction. On the merits, it granted injunctive relief, ordering MPSC, "pending resolution of the Arkansas Power & Light permanent rate case, ... [to] authorize the implementation of an interim tariff designed to facilitate collection of the FERC-ordered Grand Gulf costs which Arkansas Power and Light is currently incurring." *Arkansas Power & Light Co. v. Missouri Pub. Serv. Comm'n*, No. 86–4067–CV–C–5 (W.D.Mo., memorandum and order filed March 10, 1986), slip op. 9. MPSC obeyed the order, and AP & L promptly began collecting Grand Gulf costs from its Missouri retail customers, subject, however, to refund if

MPSC's permanent rate order should (because of offsetting items unrelated to Grand Gulf) authorize a smaller increase, or if the District Court's injunction should be reversed or modified on appeal.

Meanwhile, MPSC proceeded with the permanent rate case (which the District Court's injunction did not affect). On April 24, 1986, after the court-ordered interim rates had been in effect for about six weeks, it issued its Report and Order in the permanent rate case, IV App. 733, with an effective date of May 4, 1986, the operation-of-law date fixed at the time of the suspension order. MPSC allowed AP & L to pass through all of its Grand Gulf 1 costs, although the amount of those costs properly allocable to Missouri, it found, was only $9,033,000 per year, not the $12,000,000 AP & L had initially claimed. (AP & L had earlier reduced this claim to $10,598,000, and now does not seem to contest MPSC's further reduction to $9,033,000.) Because of savings on other items, however, permanent rate relief was limited to $5,887,767 a year, IV App. 792, a figure further adjusted on rehearing to $6,002,021, id. at 800. MPSC ordered a refund "in the amount by which the interim rates exceed the aggregate revenues authorized" in its permanent order. Id. at 795. AP & L has made the refund as ordered, but, as explained below, it still retains a portion of the money collected from retail customers under the court-ordered interim rate relief. AP & L filed a petition for review of MPSC's permanent rate order in the Circuit Court of Cole County, Missouri, but we are advised that this proceeding does not involve any Grand Gulf-related issues (all of which, after all, had been ultimately resolved in AP & L's favor by MPSC's permanent order.)

MPSC now brings this appeal from the District Court's injunction commanding interim relief. Supporting its position are the Office of Public Counsel, a body charged by Missouri law, Mo.Rev.Stat. § 386.710(2), with representing the interests of consumers in MPSC cases, and four large commercial customers, St. Joe Mineral Corporation, Ozark Lead Company, Cominco American Corporation, and GAF Cor-

poration. For convenience, we shall sometimes refer to all of the appellants as a group as "MPSC."

## II.

We first address a pair of arguments that go to our jurisdiction of the subject-matter of this case. AP & L argues that the case has become moot. If we were to accept that position, we would dismiss the appeal and remand the case to the District Court with directions to vacate its judgment and dismiss the complaint as moot. MPSC, on the other hand, argues that the case is not moot, but that the federal courts nevertheless lack jurisdiction because of the Johnson Act, 28 U.S.C. § 1342 (1982). If we were to accept that position, we would reverse the judgment and remand the case with directions to dismiss the complaint for want of jurisdiction. We reject both attacks on our jurisdiction.

## A.

■ AP & L's mootness argument runs something like this: The District Court's injunction affected only the interim-rate-relief phase of the case. It ordered MPSC to do only one thing—put into effect at once, on an interim basis, a retail rate increase reflecting the Missouri portion of Grand Gulf 1 costs imposed on AP & L by FERC. MPSC obeyed this order. Later, when the permanent rate case was decided, MPSC allowed the FERC-imposed costs in full. The total retail rate increase it granted was less than the amount of those costs, but only because other aspects of AP & L's operations justified a rate decrease. Thus, the rate increase allowed on a permanent basis was less than the interim increase, which reflected only the single factor of Grand Gulf 1 costs. AP & L has now refunded the excess—the extent to which the rate increase collected during the interim period exceeded what it would have been had MPSC's permanent rate order been in effect at that time. Because this excess has been refunded by AP & L, in accordance with a direction made by MPSC in its permanent order, nothing of sub-

stance remains in contention between the parties. They continue to disagree sharply about the propriety of federal-court intervention, but the disagreement is abstract, without practical monetary consequences.

The argument overlooks an important fact, as MPSC points out. It is only the excess of the interim rates over the permanent rates that AP & L has refunded. It retains that portion of the interim rate increase (about half) which is equal to the level of increase authorized in the permanent order. This is money AP & L would never have had absent the District Court's order, and money it cannot keep if that order is reversed. We are advised that the amount involved is about three-quarters of a million dollars. Reply Brief of Appellant MPSC 7. The disposition of this amount turns on the pending appeal. The appeal retains concrete, practical meaning, and the case is not moot.

### B.

■ The Johnson Act (named for its sponsor, Senator Hiram Johnson of California) was designed primarily to get the lower federal courts out of local utility rate cases. Those courts, Congress thought, had been too free with injunctions holding rates confiscatory and thus in violation of "substantive due process." The statute reads as follows:

### § 1342. Rate orders of State agencies

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

June 25, 1948, ch. 646, 62 Stat. 932.

All four of the statutory criteria must be met if federal jurisdiction is to be excluded. The District Court held that the first criterion had not been met here, and we agree. Jurisdiction is not based "solely" either on diversity or on "repugnance of the [rate] order to the Federal Constitution." It is based, in part at least, on the theory, not at all insubstantial, that MSPC's refusal of interim relief was in conflict with and preempted by the Federal Power Act. It is true, of course, that a federal statute overrides conflicting state law only because of the Supremacy Clause of the Federal Constitution. In a sense, therefore, a preemption claim always asserts repugnance of state law to the Federal Constitution. But such a claim does not usually require that the Constitution itself be interpreted. Rather, the meaning of federal statutes and of state law must be explored, and the extent of any conflict ascertained. A state law struck down on the basis of preemption is perhaps more aptly labeled "unstatutory" than "unconstitutional." In any case, whatever the theoretical arguments might be, all of the appellate authority in point of which we are aware upholds federal jurisdiction in utility rate cases where a substantial claim of federal statutory preemption is pleaded. *E.g., New Orleans Public Serv., Inc. v. City of New Orleans,* 782 F.2d 1236, 1242–43, *modified on other grounds,* 798 F.2d 858 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987); *International Bh'd of Elec. Workers v. Public Serv. Comm'n of Nevada,* 614 F.2d 206 (9th Cir.1980). We agree with these cases.

### III.

■ So we have jurisdiction. It does not always follow that it should be exercised. A group of doctrines lumped together under the heading of "abstention" sometimes counsels that federal courts, even when they have jurisdiction, should defer to state courts or state administrative agencies, ei-

ther by dismissing the federal suit outright, or by holding it in abeyance pending some action by the state. The courts of appeals have taken divergent approaches to the abstention question in this kind of wholesale-retail electric-rate preemption case. *Compare, e.g., Kentucky W. Va. Gas Co. v. Pennsylvania Pub. Util. Comm'n,* 791 F.2d 1111, 1115–16 (3d Cir. 1986) (rejecting abstention), *with, e.g., New Orleans Pub. Serv., Inc. v. City of New Orleans, supra,* 798 F.2d at 860–64 (approving abstention).

We need not undertake an extensive analysis of these authorities or of the various types of abstention defined by the case law. The authorities in our own Circuit, which of course bind this panel, are recent and strong, and they indicate unmistakably that the District Court was correct in deciding not to abstain. In *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n,* 824 F.2d 672 (8th Cir.1987), a public utility brought suit for an injunction in a federal district court claiming that a retail-rate order of a state commission was preempted by a federal statute (there, the National Labor Relations Act). We squarely upheld the District Court's decision to exercise its jurisdiction, rejecting arguments similar to the ones made by MPSC here. "Where a challenge to a state regulatory scheme asserts that the proceeding or regulation at issue is beyond the state's authority [because of preemption by a federal statute], abstention ... arguments are seldom applicable." *Southwestern Bell,* 824 F.2d at 673 (footnote omitted). *Accord, Middle*

*South Energy, Inc. v. Arkansas Pub. Serv. Comm'n,* 772 F.2d 404, 417–18 (8th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). The point is especially strong in a case like the present one, in which Congress has established a federal agency to resolve competing local interests, and not just one state, but several, all with interests adverse to each other, are involved. "The independent interest of any single state in such an inherently interstate controversy is not sufficient to justify denying the federal plaintiff the choice of a federal judicial forum." Brief for the United States and the Federal Energy Regulatory Commission as Amici Curiae, p. 16, filed in *American Elec. Power Co. v. Kentucky Pub. Serv. Comm'n,* No. 86–49, Supreme Court of the United States.[3]

We endorse the District Court's refusal to abstain.

## IV.

■ On the merits, an important but narrow question is presented: whether MPSC, which concededly must ultimately recognize as reasonable the costs of capacity imposed on AP & L by FERC, is also obliged, by the preemptive force of the Federal Power Act, to allow an immediate pass-through of these costs, without regard to the ordinary process of suspension and investigation provided by state law.[4] Both sides rely on the Supreme Court's recent opinion in *Nantahala Power & Light Co. v.*

---

**3.** Certiorari was denied in this case on April 20, 1987, —— U.S. ——, 107 S.Ct. 1910, 95 L.Ed.2d 515.

**4.** Because the parties before us, at least for purposes of the present case, do not deny that the FERC-ordered costs must ultimately be accepted by MPSC, it is not necessary for us to consider whether MPSC has authority to determine the "prudence" or reasonableness of AP & L's purchasing capacity from MSE, as opposed to some other reasonably available source. For discussion of the question whether such an exception to the ordinary preemptive effect of a FERC order may exist, see *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 106 S.Ct. 2349, 2360, 90 L.Ed.2d 943 (1986). MPSC was probably wise to make the concession it did, because the prudence argument would be a par-

ticularly difficult one under the facts of the present case. AP & L has not chosen to buy energy from Grand Gulf 1, in preference to some other source that might, in the end, appear more reasonable. It has been forced against its will by FERC to share the costs of the Grand Gulf 1 generating capacity. It might be argued that the entire Grand Gulf enterprise was unreasonable in its inception, being based upon imprudent estimates of future demand and the relative costs of different fuels. Such an argument, however, might well be foreclosed by FERC's own finding that Grand Gulf 1 was part of a reasonable system plan to diversify MSU's fuel base by developing nuclear power to meet anticipated growth in demand. See 31 FERC at pp. 61,651–53, 61,656.

*Thornburg,* 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). There, in explaining why a FERC order allocating low-cost power between two affiliated utilities had to be accepted and respected by a state commission, the Court reasoned that certain costs, of necessity incurred by the retailer in obedience to FERC's command, would be "trapped" if they could not be passed on to customers. It is certainly true that, absent the District Court's injunction, AP & L would be subjected to such "trapping" of costs, assuming (as actually happened) that MPSC chose to suspend AP & L's new rate filing seeking to pass on these costs to its customers. MPSC, on the other hand, cites a passage in *Nantahala* which indicates that local commissions, although they must treat federally ordered costs as reasonable, may consider those costs under the ordinary rate-making procedures applicable to rate filings generally. One such procedure, of course, is the local rate-making authority's ability to suspend rates and allow them to go into effect only after the expiration of a period set by statute for investigation and hearing.

We think MPSC has the better of this argument. Although the FERC order clearly contemplates that costs will have to be passed on to retail customers, it also "clearly recognize[s] the role of the States in regulating retail electric rates and the need to balance overlapping State and Federal electric rate jurisdiction." 32 FERC at 61,951. "[R]etail rate regulation should be left to the States," *id.* at 61,952, and FERC should proceed "with as little intrusion on the States as possible." *Id.* No one claims that the FERC order in express words commands an immediate pass-through or purports to override ordinary state suspension and investigation procedures, nor is there any language in the Federal Power Act that would indicate that Congress had any such intention.

The answer to the question is clearly implied, if not expressly determined, by language in the *Nantahala* opinion itself. The Court first observes:

> Once FERC sets a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are un-

reasonable. A state must rather give effect to Congress's desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority.

106 S.Ct. at 2357. This does not mean, however, that FERC-approved wholesale rates must always be passed on intact. A utility may have experienced savings in other areas that would justify the rate-making authority in adjusting retail rates in such a way that they do not fully and automatically reflect FERC-imposed wholesale costs:

> [D]ivergence between wholesale and retail rates would occur only if costs *other than* those resulting from the purchases of FERC-regulated power or gas were to decrease. See *Narragansett,* 119 R.I., at 568, 381 A.2d, at 1363 ("The commission ... may treat the proposed rate increase as it treats other filings ... and investigate the overall financial structure of [the power company] to determine whether the company has experienced savings *in other areas which might offset the increased price*") (emphasis added); *Public Service Co.,* 644 P.2d, at 941 ("[The commission] may treat the [increase] as it treats other filings for proposed rate increases ... [and] investigate whether [either of the gas companies] has experienced *savings in other areas which might offset the increased price for natural gas to consumers*") (emphasis added).

106 S.Ct. at 2357 (brackets in original).

An examination of the two cases thus cited by the Supreme Court with approval is instructive. In *Narragansett Elec. Co. v. Burke,* 119 R.I. 559, 381 A.2d 1358 (1977), *cert. denied,* 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978), the Supreme Court of Rhode Island, enunciating what has since come to be called the *Narragansett* doctrine, held first that, under the Supremacy Clause, purchased-power costs filed with FERC must be treated as actual operating expenses. The Court also held, however, that it was not unlawful for the state commission to suspend the local utility's purchased-power cost adjustment filing

for nine months in accordance with state law. "The commission ... may treat the proposed rate increase as it treats other filings for charged rates ... and investigate the overall financial structure of Narragansett to determine whether the company has experienced savings in other areas which might offset the increased price for power." 119 R.I. at 568, 381 A.2d at 1363. Significantly, this is the very passage quoted with approval by the Supreme Court in *Nantahala. Public Service Co. of Colorado v. Public Utilities Comm'n*, 644 P.2d 933, 941–42 (Colo.1982), also cited in *Nantahala*, is to the same general effect.

The implication is strong that the Supreme Court was familiar with the common practice of state commissions to suspend and investigate rate filings before allowing them to go into effect, and that it did not consider this practice, in and of itself, to be preempted by the Federal Power Act. State commissions, in other words, must respect, defer to, and accept FERC's determinations with respect to wholesale rates, and may not reexamine the reasonableness of those determinations in the context of a retail-rate proceeding. Ultimately, unless savings in other areas are shown by the record, the FERC-approved costs must be passed through. But the determination whether there are such savings in other areas takes time, and, to the extent permitted by state law, retail rate filings may be suspended for a reasonable time in order to afford state authorities the opportunity to investigate whether such other cost savings exist. In addition, a reasonable period of suspension and investigation may be necessary for at least two other purposes. Where, for example, as in the present case, the electric utility seeking a retail rate increase serves customers in more than one state, the question arises what portion of the FERC-ordered wholesale costs is properly allocable to each state. That question has of course not been determined by FERC. Furthermore, even if the entire cost must be passed through, a question of rate design remains. Which of the companies' classes of customers, commercial, industrial, and residential, shall bear the increase, and in what proportions? These issues, again, are not covered by the FERC order and would, we suppose, actually be beyond FERC's jurisdiction.

If MPSC were guilty of bad faith, or if it were not in fact applying to these federally ordered costs the same state-law procedures generally applicable to retail rate increases, quite a different question would be presented. We are not persuaded on the present record either that MPSC is guilty of bad faith, or that it is treating federal costs, either *de facto* or *de jure*, less advantageously than other costs. Accordingly, we hold that the ordinary state-law process of suspension and investigation is not preempted, under the circumstances of this case, by the Federal Power Act.

We recognize that some unfairness to the utility may result from this decision. This unfairness, we believe, is simply one aspect of the problem of "regulatory lag." A state might well choose, and some states have chosen, to allow utilities to place retail rate increases into effect under bond, with provision for refund in the event that the increases are ultimately disapproved. Whether Missouri or any other state makes such a choice, however, is, in our opinion, a legislative question, to be decided by the people's elected representatives, and not by judges. It seems to be universally acknowledged that the Due Process Clause, either of the Fifth or of the Fourteenth Amendment, does not forbid a reasonable period of rate investigation, during which increases are held in abeyance. *E.g., Hope Natural Gas Co. v. FPC*, 196 F.2d 803, 808–09 (4th Cir.) (Parker, C.J.), *rehearing denied*, 197 F.2d 522 (4th Cir.1952). By a parity of reasoning, it follows, we think, that the Federal Power Act, in leaving retail rate regulation to the states, also leaves with them the choice whether to allow rates to go into effect at once, or to suspend rates with retroactive recovery of costs later, or (Missouri's choice) to suspend rates and forbid retroactive rate making.

We can imagine a case in which federally imposed costs are so large that the customary state-law suspension period, if invoked by state authorities, could jeopardize the

utility's very ability to serve the public. In such a case, a different and more difficult issue of preemption, or of violation of the Commerce Clause itself, would be presented. That is not the case before us. The Missouri portion of Grand Gulf 1 costs is relatively small, and AP & L does not argue that this portion, considered alone, places it in a financial crisis imperatively requiring emergency relief. This is so, at least in part, because AP & L and the Arkansas Public Service Commission have wisely settled the pass-through issue as it applies to retail customers in Arkansas. We address only the case before us, and we do so mindful that federal preemption should be found only if clearly required to prevent the frustration of federal policy. We are unable to make such a finding here.

### V.

To summarize:

We hold that the District Court had jurisdiction and properly decided to exercise it. On the merits, we hold that the ordinary Missouri statutory process of suspension and investigation is not preempted by the Federal Power Act. The judgment of the District Court, commanding MPSC to authorize an immediate pass-through without regard to this statutory process, is reversed. This cause is remanded to the District Court for further proceedings consistent with this opinion, including consideration of the manner in which that portion of the interim rate increase that AP & L still retains should be refunded to its retail customers in Missouri. We direct that all parties bear their own costs on this appeal.

It is so ordered.