NEW ORLEANS PUBLIC SERVICE, INC., Plaintiff–Appellant,

v.

The COUNCIL OF the CITY OF NEW ORLEANS, et al., Defendants–Appellees.

No. 90–3050.

United States Court of Appeals, Fifth Circuit.

Aug. 29, 1990.

Rehearing Denied Oct. 17, 1990.

---

Herschel L. Abbott, Jr., Jones, Walker, Waechter, Portevent, Carrere & Denegre, New Orleans, La., David W. Carpenter, Sidley & Austin, Chicago, Ill., Rex E. Lee, Brigham Young University, Provo, Utah,

Thomas O. Lind, New Orleans, La., for plaintiff-appellant.

Joseph Bernstein, New Orleans, La., for Alliance.

Okla Jones, II, City Atty., Michael W. Tifft, Walter J. Wilkerson, New Orleans, La., Clinton A. Vince, Bernhardt K. Wruble, Verner & Liipert, Washington, D.C., Kenneth Carter, Sidney Cates, Carter & Cates, New Orleans, La., for defendants-appellees.

Before WISDOM, HIGGINBOTHAM, and DUHÉ, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

New Orleans Public Service, Inc. asks us to reverse the district court's determination that the Council's retail rate order is not "facially" preempted by federal law, specifically a wholesale rate order the Federal Energy Regulatory Commission made under the Federal Power Act. The Council's order prevented NOPSI from recovering, in its retail rate, wholesale costs FERC ordered it to incur as a result of its participation in building the Grand Gulf 1 nuclear reactor in Port Gibson, Mississippi. In the alternative, NOPSI asks us to reverse the district court's decision to stay NOPSI's remaining claims in light of pending state court proceedings. The remaining claims include an allegation that the stated reasons underlying the Council's order were a pretext for an impermissible attack on FERC's order. We affirm the district court's order, rejecting NOPSI's "facial" preemption challenge, in part because of the reading the Supreme Court gave the Council's order on a previous appeal. We further hold that the district court did not abuse its discretion in staying decision of the remaining claims, although it did not acknowledge the relevance of the Council members' motivation to NOPSI's pretext claim in making that decision. Our reading of the Court's opinion on the previous appeal compels us to conclude that the pretext claim cannot succeed in the face of a determination that the stated reasons underlying the Council's order were sufficiently supported by the evidence; and the state trial court had already determined that they were. There was thus no substantial federal issue remaining in the case, and the district court's order was not otherwise an abuse of discretion.

## I.

This case has produced several judicial opinions, including three from this court. At each juncture the case was in a different posture, with different issues. This opinion is no exception. Thus, we repeat the facts for perspective.

## A.

NOPSI is a producer, wholesaler, and retailer of electricity, providing its retail services to the city of New Orleans. Along with Arkansas Power and Light, Mississippi Power and Light, and Louisiana Power and Light, it is a wholly owned operating subsidiary of Middle South Utilities, Inc.[1] MSU operates an integrated "power pool" in which NOPSI and the three other power companies transmit the electricity they produce to a central dispatch center, and each draws back the power it needs to meet customer demand.

Through the 1950's and into the 1960's, most of the MSU system's generating plants were fueled with oil or gas. In the late 1960's, MSU sought to meet projected increases in demand by adding coal-fired and nuclear energy powered generating plants. Originally, MSU planned for each of the power companies to construct one or more nuclear facilities. Mississippi Power and Light was charged with constructing two plants at Port Gibson, Mississippi, to be known as Grand Gulf 1 and 2. The Grand Gulf project quickly proved too burdensome for one company, however. MSU created another subsidiary, separate from the power companies, known as Middle

1. Since this case began, Middle South Utilities has changed its name to Entergy Corporation.

The parties refer to it by the old name in the briefs, and, for convenience, we do so as well.

South Energy, Inc. to finance, own, and operate the Grand Gulf plants.[2] In 1974, MSE in turn contracted with the power companies to finance the project. The companies agreed to pay for the construction of the plants in exchange for the right to their output. The estimated construction cost at that time was $1.2 billion.

As the project progressed, consumer demand for electric power proved to be much lower than MSU and the power companies had expected. At the same time, regulatory delays, enhanced construction requirements resulting from the Three Mile Island accident, and high inflation led to spiraling costs on the Grand Gulf project. As a result, MSE suspended construction of Grand Gulf 2, although it continued to build Grand Gulf 1. The cost of completing Grand Gulf 1 alone eventually exceeded $3 billion.

The power companies considered various methods to allocate the cost of Grand Gulf in light of these developments. In 1982, MSU filed a Unit Power Sales Agreement with the Federal Energy Regulatory Commission, which set out the shares of Grand Gulf 1 output each company was required to purchase in order to pay the construction costs. Arkansas Power and Light, which had finished its own nuclear plants, was not obligated to purchase any Grand Gulf power. Louisiana Power and Light, which had not finished its plant, was obligated to purchase 38.57%. Mississippi Power and Light was obligated to purchase 31.63%, and NOPSI 29.8%. MSU also filed a new System Agreement with FERC, which set forth the terms and conditions for coordinated operations and wholesale transactions among the four companies, but did not deal with the Grand Gulf costs.

FERC assigned the agreements to two separate Administrative Law Judges for the statutorily required task of determining whether they were just and reasonable. Both judges held that the failure to distribute the Grand Gulf costs among all the members rendered the agreements unduly discriminatory; ALJ Head further held that these costs should be allocated in proportion to each company's relative system demand. *Middle South Services, Inc.,* 30 F.E.R.C. ¶ 63,030, pp. 65,170–65,173 (1985) (System Agreement); *Middle South Energy, Inc.,* 26 F.E.R.C. ¶ 63,044, pp. 65,105–65,108 (1984) (Unit Power Sales Agreement) (ALJ Head). FERC consolidated the proceedings for review, and determined that an adjustment of the shares allocated in the Unit Power Sales Agreement was all that was necessary to render both agreements just and reasonable. FERC reduced NOPSI's share from 29.8% to 17%. The decrease did not satisfy the New Orleans City Council, however, which had argued for a 9% share for NOPSI.[3] The D.C. Circuit ordered FERC to reconsider the allocations. *Mississippi Industries v. FERC,* 808 F.2d 1525, modified on rehearing 822 F.2d 1104 (D.C.Cir.), *cert. denied,* 484 U.S. 985, 108 S.Ct. 500, 98 L.Ed.2d 499 (1987). FERC did so, and reaffirmed them; the D.C. Circuit affirmed that decision. *City of New Orleans v. FERC,* 875 F.2d 903 (D.C.Cir.1989), *cert. denied sub nom. Mississippi v. FERC,* —— U.S. ——, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990).

Although its order did not expressly discuss the prudence of the project, FERC implicitly accepted the uncontroverted testi-

---

**2.** Middle South Energy is now known as Systems Energy Resources, Inc. Again, the parties refer to it by the old name in the briefs and we do so as well.

**3.** FERC found that Grand Gulf 1 had been planned, constructed, and completed to meet the needs of the MSU System "as a whole." *Mississippi Power and Light,* 108 S.Ct. at 2434; 31 FERC ¶ 61,305, pp. 61,651–57 (1985). FERC further found that this was part of a "reasonable" system plan to diversify power sources, so it established rates that would allow MSE to recoup 100% of the Grand Gulf costs from the power companies. FERC then found that the four companies should take shares of the System's total nuclear power in proportion to their relative demand for all energy generated by the system. *Mississippi Power and Light,* 108 S.Ct. at 2435. As the Council points out, NOPSI's demand is 9% of the total system demand. Thus, FERC required it to bear 9% of the System's total nuclear power costs. Since NOPSI had no nuclear plant of its own, it had to bear 17% of the Grand Gulf costs in order to bear 9% of the total nuclear power costs.

mony of MSU executives, who explained why they believed the decision to construct and complete Grand Gulf 1 was sound. It also approved one of the ALJ's findings to that effect. *See Mississippi Power and Light v. Mississippi ex rel. Moore*, 487 U.S. 354, 362, 108 S.Ct. 2428, 2434, 101 L.Ed.2d 322 (1988).

## B.

The Council is the local ratemaking body with final authority over NOPSI's retail rates. *See* 16 U.S.C. § 824(b); La.Rev.Stat. Ann. §§ 33:4405, 33:4495 (West 1988); *see also* the New Orleans Home Rule Charter § 4-1604. NOPSI applied to the Council for a retail rate increase to cover the increase in its wholesale rates resulting from the FERC allocation. The increase NOPSI sought would have resulted in an immediate 60% increase in retail rates. The Council denied an immediate rate adjustment, explaining that a public hearing was necessary to determine the "legality" and prudence of NOPSI's decision to enter the Grand Gulf contracts.

NOPSI responded by filing an action in the district court, requesting injunctive and declaratory relief, on the theory that FERC's order required the Council to allow NOPSI to pass all of the allocated costs to its retail customers. The district court dismissed the case, holding that under the Johnson Act, 28 U.S.C. § 1342, it lacked jurisdiction to proceed, and noted that if it had had jurisdiction, it would have abstained pursuant to *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). We reversed, but then affirmed on panel reconsideration because we decided abstention was proper under both *Burford* and *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *NOPSI v. The City of New Orleans*, 782 F.2d 1236, *modified on panel rehearing*, 798 F.2d 858 (5th Cir.1986) (*NOPSI I*).

On October 10, 1985, while *NOPSI I* was pending before us, the Council began its investigation. In a resolution, the Council said it would examine all aspects of NOPSI's participation in the Grand Gulf projects, including Grand Gulf's impact on other power supply opportunities, and NOPSI's efforts to minimize its total cost exposure for the Grand Gulf project. The resolution specifically provided that, in determining the appropriate retail rate increase, the Council would not seek to invalidate any of the agreements surrounding Grand Gulf 1 or to order NOPSI to pay MSE a wholesale rate other than that approved by FERC.

In November 1985, with *NOPSI I* still pending before us, NOPSI filed *NOPSI II* in the district court, seeking to enjoin the Council from preventing the pass-through. The district court dismissed on ripeness grounds, and in the alternative abstained. We affirmed on the ripeness issue. *NOPSI v. The Council of the City of New Orleans*, 833 F.2d 583 (5th Cir.1987).

The Council completed its investigation on February 4, 1988, and entered a final order disallowing some of the requested increase. The order prevented NOPSI from passing through $135 million of the Grand Gulf costs. This meant that, instead of passing through the full 17% FERC required it to bear, NOPSI could pass through only 14%, the amount the Council had argued NOPSI should bear in the FERC proceedings.

NOPSI then filed this action (*NOPSI III*) in the district court, and a parallel state action challenging the order. In the district court, NOPSI argued the Council's order was preempted under *Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). The district court abstained under *Burford* and we affirmed, holding abstention proper under both *Burford* and *Younger*. The Supreme Court granted certiorari and reversed, holding abstention improper on either ground. *NOPSI v. The Council of the City of New Orleans*, —— U.S. ——, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989).

On remand, NOPSI again argued that the Council's order was preempted, because on its face it impermissibly contradicted the FERC order; or alternatively, that the Council's reasons for denying a pass-through were a pretext to attack the

FERC allocation. The district court held that the Council's order was not "facially" preempted, and stayed the rest of the case because the Louisiana trial court had already issued a judgment in the Council's favor in the parallel state proceedings. The state trial court held that the Council's order was supported by substantial evidence. The matter is now pending in the state court of appeals. The district court rested its decision to stay on *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). The district court did not consider the relevance of the Council members' motivation to NOPSI's pretext claim in any portion of its opinion. NOPSI brought this appeal.

## II.

■■■ We first consider whether the district court properly determined that the Council's order was not "facially" preempted. The preemption doctrine is not without its difficulties. At least as a point of departure it is fair to observe that federal law may preempt state law in three ways. First, Congress may expressly define the extent to which it intends to preempt state law. Second, Congress may only signal intent to occupy an area. Third, state laws that conflict with federal laws are preempted, even if Congress has not expressly preempted them or otherwise signaled its intent to occupy the area. *Michigan Canners and Freezers Association v. Agricultural Marketing and Bargaining Board*, 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984); *Burlington Northern R. Co. v. Public Utilities Commission of Texas*, 812 F.2d 231 (5th Cir.1987). "Facially" preempted state laws, as the parties use the term, are those which the court can tell are preempted in one of these three ways simply by looking at the federal law, the challenged state law, and the cases applying them.

The Council argues that the Supreme Court foreclosed this claim in *NOPSI III*.

As the Council concedes, the Court did not do so explicitly. Indeed, the Court reversed our holding on *Burford* abstention because the facial preemption challenge, limited as it was to the "four corners of the Council's retail rate order," would not unduly intrude into state processes or undermine the state's ability to maintain uniformity in retail rate regulation. 109 S.Ct. at 2515. Far from foreclosing the claim, the Court reversed our decision because we did not allow the district court to consider it. The Court's ensuing discussion of *Younger* abstention, however, generates some confusion. NOPSI argued that, even if *Younger* should apply to state retail rate proceedings, abstention in this case was inappropriate because a stay would cause NOPSI irreparable harm. Irreparable harm sufficient to preclude a stay occurs when the state law sought to be enforced is flagrantly and patently violative of express constitutional provisions. NOPSI argued that the same rule should apply if the state law similarly violated federal statutes and regulatory orders, and that the Council's order was such a state law. The Court responded:

> [W]e do not have to decide the matter here, since the proceeding and order at issue do not meet that description. The Council has not sought directly to regulate interstate wholesale rates; nor has it questioned the validity of the FERC-prescribed allocation of power within the Grand Gulf system, or the FERC-prescribed wholesale rates; nor has it reexamined the prudence of NOPSI's agreement to participate in Grand Gulf 1 in the first place. Rather, the Council maintains that it has examined the prudence of NOPSI's failure, after the risk of nuclear power became apparent, to diversify its supply portfolio, and that finding that failure negligent, it has taken the normal ratemaking step of making NOPSI's shareholders rather than the ratepayers bear the consequences. Nothing in this is directly or even indirectly foreclosed by the federal statute, the regulations implementing it, or the case law applying it. There may well be reason to doubt the Council's necessary

factual finding that NOPSI would have saved money had it diversified. But we cannot conclusively say it is wrong without further factual inquiry—and what requires further factual inquiry can hardly be deemed "flagrantly" unlawful for purposes of a threshold abstention determination.

109 S.Ct. at 2517. We are of course bound by the Court's characterization of the order. It is plain, however, that the Court held only that the order was not "flagrantly" unlawful for *Younger* abstention purposes; it did not hold the facial preemption claim was foreclosed. We therefore are required to consider that claim on the merits. In so doing, we must, and we will, look to the Court's characterization for such guidance as it provides.

### A.

NOPSI's facial preemption claim, as well as its pretext claim, is grounded in an aspect of the filed rate doctrine, which the Court established in *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), in dismissing a power company's challenge to the reasonableness of wholesale rates it had paid in the past. The Federal Power Commission, acting pursuant to its authority under the Federal Power Act, had determined that the challenged rates were reasonable, and the Court held that the FPC's determination settled the matter. The Court said that federal courts had no power to set a rate other than that determined by the FPC, except upon direct review of the FPC's order, and the case was not in that posture. 341 U.S. at 251–252, 71 S.Ct. at 695–696.

The Court has since held that this aspect of the filed rate doctrine applies to state courts as well, not as a rule of administrative law, as in the federal context, but rather as a means of enforcing the Supremacy Clause. *See, e.g., Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (state court could not allow utility to charge a wholesale rate not approved by the FPC because the state court thought the FPC would have approved the rate as reason-able; the determination of reasonableness belonged solely to the FPC).

Several state courts have held that a state utility commission setting retail rates must allow, as reasonable operating expenses, costs incurred as a result of paying a FERC-determined wholesale price. *See, e.g., Narragansett Electric Co. v. Burke*, 119 R.I. 559, 381 A.2d 1358 (1977); *Public Service Co. of Colorado v. Public Utilities Commission*, 644 P.2d 933 (Colo.1982); *United Gas Corp. v. Mississippi Public Service Commission*, 240 Miss. 405, 127 So.2d 404 (1961). These courts viewed their decisions as applications of the filed rate doctrine. The Court has approved these cases, characterizing the decisions as "properly driven by the need to enforce the exclusive jurisdiction vested by Congress in FERC over the regulation of interstate wholesale utility rates." *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. at 966, 106 S.Ct. at 2356. It is plain, then, that if the purpose or effect of the Council's order is to redetermine NOPSI's share of Grand Gulf, even if only for the purpose of setting retail rates, it is preempted by FERC's order. *Nantahala* and *Mississippi Power and Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) guide our analysis.

In *Nantahala*, Nantahala Power and Light Co. and Tapoco, wholly owned subsidiaries of Alcoa, owned hydroelectric plants, which they allowed the TVA to operate. In exchange, the TVA provided them jointly with a fixed supply of low-cost power. Nantahala also bought high-cost power from the TVA's power grid. An agreement between Nantahala and Tapoco gave Nantahala 20% of the low-cost power, and Nantahala calculated its wholesale and retail rates on that basis. FERC reviewed this agreement in a wholesale ratemaking proceeding, and determined that the agreement was unfair and that Nantahala was entitled to 22.5% of the low cost power. FERC ordered Nantahala to use that figure in calculating its wholesale rates. When Nantahala later applied to the North Carolina Utilities Commission for a retail rate increase, the NCUC essentially deter-

mined that the agreement was more unfair to Nantahala than FERC said it was, and that Nantahala was entitled to 24.5% of the low cost power. It required Nantahala to calculate its retail rates on that basis. The Court, citing the state court cases noted above, held the NCUC's order preempted by FERC's order, because "a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority." 476 U.S. at 966, 106 S.Ct. at 2356.

The Court noted that, in *Narragansett* and *Public Service Co. of Colorado,* the state courts held that an increase in FERC-ordered wholesale rates need not always lead to a corresponding increase in retail rates. Retail rates might increase less sharply than wholesale rates, or even go down, if the utility's costs *other than* those attributable to the FERC-approved wholesale rates decrease. *Narragansett,* 381 A.2d at 1363; *Public Service Co.,* 644 P.2d at 941. The Court in *Nantahala* called this qualification "perfectly sensible," but said that it did not apply there, because the NCUC did not rest its decision on that basis, but on its disapproval of the FERC-imposed rate. 476 U.S. at 968, 106 S.Ct. at 2357.

The Court also noted that, in certain circumstances, a utility's purchase of a particular quantity of high cost power at FERC-approved rates might be unreasonable, if lower cost power were available from another source. *Id.* at 972, 106 S.Ct. at 2359. Some courts have denied pass-throughs for exactly that reason. *See Pike County Light & Power Co. v. Pennsylvania Public Utility Commission,* 77 Pa.Commw. 268, 465 A.2d 735 (1983); *Kansas–Nebraska Natural Gas Co. v. State Corporation Commission,* 4 Kan.App.2d 674, 610 P.2d 121 (1980); *Kentucky–West Virginia Gas Co. v. Pennsylvania Public Utilities Commission,* 837 F.2d 600 (3d Cir.1988). The Court determined, however, that this line of cases had no application where FERC has not only determined the rate the utility

must pay for the power, but also the amount of the power the utility must purchase. In that case, there is no lower cost power available that can lessen the amount of power the utility must buy at FERC rates. 476 U.S. at 972–973, 106 S.Ct. at 2359–2360.

*Mississippi Power and Light* involved the same FERC allocation that is at issue here. The UPSA assigned MP & L a 31.63% share of Grand Gulf 1's costs; FERC changed that to 33%. The Mississippi Public Service Commission originally refused to allow MP & L to pass through any of these costs, but then reversed itself and allowed MP & L to pass all of them through. It did so because it concluded that MP & L would otherwise become insolvent. The Mississippi Supreme Court reversed that order, holding that the Public Service Commission had no authority under state law to allow the pass-through without conducting a prudence review, and that such a review was not preempted by federal law. The court remanded the case to the Public Service Commission to "determine whether MP & L, [MSE], and MSU acted reasonably when they constructed Grand Gulf 1, in light of the change in demand for electric power in this state and the sudden escalation of costs." *Mississippi ex rel. Pittman v. Mississippi Public Service Commission,* 506 So.2d 978, 987 (Miss. 1987).

The Court reversed, holding that "our decision in *Nantahala* rests on a foundation that is broad enough to support the order entered by FERC in this case and to require the MPSC to treat MP & L's FERC-mandated payments for Grand Gulf costs as reasonably incurred operating expenses for the purpose of setting MP & L's retail rates." 108 S.Ct. at 2438. The Court said that *Nantahala* rested on three "fundamental principles concerning the preemptive impact of federal jurisdiction over wholesale rates on state regulation": (1) that FERC has exclusive authority to determine the reasonableness of wholesale rates; (2) that FERC's exclusive jurisdiction applies not only to rates, but also to power allocations that affect wholesale

rates; and (3) that states may not bar regulated utilities from passing through to retail consumers FERC-mandated wholesale rates. 108 S.Ct. at 2439. Those principles prevented the NCUC's action in *Nantahala,* and the Court held they prevented the MPSC from conducting the prudence review ordered by the Mississippi Supreme Court. *Id.* The Court held that the *Pike County* line of cases noted above had no application, just as it had none in *Nantahala,* because FERC had determined the amount of Grand Gulf power MP & L had to buy. *Id.* 108 S.Ct. at 2440. The Court also rejected an argument that FERC did not have jurisdiction to determine the reasonableness of MP & L's decision to participate in Grand Gulf. *Id.* 108 S.Ct. at 2440–2441.[4]

■ In sum, then, there were several things the Council was not entitled to do in the prudence inquiry. It could not base any disallowance on NOPSI's purported imprudence in deciding to participate in Grand Gulf in the first place. That is the holding of *Mississippi Power and Light.* The Council could not, of course, challenge the FERC price as inappropriate. That is the point of the entire line of filed rate doctrine cases. The Council also could not penalize NOPSI for buying an unreasonably high amount of Grand Gulf power, because FERC allocated the power NOPSI had to buy. NOPSI had no legal right to take any less. *Nantahala* established that the *Pike Co.* line of cases did not apply to facts like ours; *Mississippi Power and Light* established specifically that they do not apply to our facts. We therefore must determine exactly what the Council did, and whether, in light of the cases, it was entitled to do it.

### B.

We have noted that the Supreme Court has already characterized the Council's order as follows:

The Council has not sought directly to regulate interstate wholesale rates; nor has it questioned the validity of the FERC-prescribed allocation of power within the Grand Gulf system, or the FERC-prescribed wholesale rates; nor has it reexamined the prudence of NOPSI's agreement to participate in Grand Gulf 1 in the first place. Rather, the Council maintains that it has examined the prudence of NOPSI's failure, after the risk of nuclear power became apparent, to diversify its supply portfolio, and that finding that failure negligent, it has taken the normal ratemaking step of making NOPSI's shareholders rather than the ratepayers bear the consequences.

*NOPSI III,* 109 S.Ct. at 2517. Even were we convinced otherwise, we are bound by the Court's characterization of the order. We agree with the Court's characterization in any event. All that is left, then, is to determine whether the foregoing preemption cases permit the Council to make this order.

### C.

■ *Nantahala* and *Mississippi Power and Light* reaffirmed the well-established principle that if FERC has jurisdiction over a subject, states cannot have jurisdiction over it. *Mississippi Power and Light* established that FERC had jurisdiction to determine whether the various utilities acted prudently in deciding to participate in the Grand Gulf venture, and that the states were therefore precluded from conducting prudence inquiries on that subject. The order before us presents a variation of that question. We must decide whether FERC has jurisdiction to determine whether NOPSI acted prudently once the Grand Gulf project was underway. To do so, we must determine whether the Federal Power Act grants FERC this jurisdiction.

The first step in making this determination is to decide whether FERC has asserted this jurisdiction. We defer to FERC's

---

4. The Court's reasons for rejecting this argument were a bit murky. It stated that the reason FERC did not consider its jurisdiction was because the parties did not raise it, not because jurisdiction was lacking. Justice Scalia, concurring in the judgment, and Justice Brennan, dissenting, wrote separately to discuss the issue more thoroughly.

construction of the act if it does not violate the act's plain meaning and is a reasonable interpretation of silence or ambiguity. *See Mississippi Power and Light*, 108 S.Ct. at 2443 (Scalia, J., concurring in the judgment) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). In *Mississippi Power and Light*, Justice Scalia, concurring in the judgment, and Justice Brennan, dissenting, debated whether this presumption applies to FERC's assertions of jurisdiction under the act. The majority's position on this point is not clear. It concluded that FERC did have jurisdiction over that particular prudence question. We need not enter this thicket here, however, for it is plain that FERC did not assert jurisdiction to determine NOPSI's prudence in not acting to minimize its losses.[5]

We therefore must determine only whether this is a matter that Congress has nevertheless committed to FERC's exclusive jurisdiction. In doing so, we must presume that state law is not preempted, as this is an area traditionally regulated by the states under their historic police powers. Courts must assume that these state powers were not to be superseded by the Act in the absence of clear and manifest Congressional purpose. *California v. ARC America Corp.*, 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct.

1146, 91 L.Ed. 1447 (1947). We are pointed to nothing to suggest that Congress has done so.[6] Indeed, finding such jurisdiction would work the result Justice Brennan feared in *Mississippi Power and Light*, that is, to "divest states of authority to determine the prudence of costs incurred by retail utilities whenever those utilities belong to an interstate pool." 108 S.Ct. at 2449 (Brennan, J., dissenting). We would require a firmer statement of intent to preempt before finding such intrusive federal jurisdiction to exist.

Further, we are convinced that the Court in *NOPSI III* did not believe the Council could not regulate NOPSI's activities in this regard. It said that nothing in the Council's order was directly or even indirectly foreclosed by prior preemption decisions. *NOPSI III*, 109 S.Ct. at 2517. Indeed, this seems analogous to the exception the Court called "perfectly sensible" in *Nantahala*, 476 U.S. at 968, 106 S.Ct. at 2357; *see Narragansett*, 381 A.2d at 1363; *Public Service Co.*, 644 P.2d at 941. If states may deny pass throughs because costs have gone down in other areas, it seems logical that they should be able to deny them because costs would have gone down if the utility had not been imprudent. We therefore hold the order is not facially preempted.

### III.

As we have noted, NOPSI has not rested its preemption argument solely on

---

5. NOPSI argues vigorously that the Council's order essentially relitigates several matters FERC had already decided. Appellant's brief at 43–48. We have already rejected this argument, relying on *NOPSI III*. See part II.B of this opinion. If the Council's order did this, the Court in *NOPSI III* would not have been able to conclude that nothing in the order was directly or indirectly foreclosed by the FERC order. In any event, the opposite conclusion still would not compel us to hold FERC asserted jurisdiction to decide NOPSI's prudence in not acting to minimize its losses. We would only be compelled to conclude that some of the issues that were relevant to FERC's wholesale rate proceeding were also relevant to the Council's proceeding. Of course, in that case, the Council would have been bound by FERC's resolution of those issues.

6. Congress of course need not expressly grant FERC the power to preempt a particular state action. Rather, when state law is alleged to be preempted by federal regulation, the court must determine whether the agency action is preemptive (making the same inquiry as for a statute); the agency's choice to act preemptively will be upheld whenever the action "represents a reasonable accommodation of ... policies that were committed to the agency's care by the statute." *City of New York v. F.C.C.*, 486 U.S. 57, 63, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988). Nevertheless, the grant of regulatory authority can itself be preemptive. *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988).

the Council order's facial invalidity. NOPSI also argues that, whatever the order's facial validity, the reasons given for denying the pass through were pretexts for the Council members' true, but impermissible, objective of attacking both the FERC allocation and NOPSI's imprudence in participating in Grand Gulf in the first place. We are unable to locate an express reference to this aspect of NOPSI's argument in the district court's opinion.[7]

In its brief and at oral argument, the Council urged that NOPSI never raised this pretext claim in its complaint. Whether we would reach the same conclusion on a fresh reading of the complaint is not relevant, however, because the Supreme Court has already held that NOPSI did raise this claim in its complaint. *NOPSI III*, 109 S.Ct. at 2515 ("It is true that in its initial complaint, NOPSI asserted, as an alternative to its facial preemption challenge, that the rate order's nominal emphasis on NOPSI's failure in 1979–80 to diversify its power supply by selling off a portion of its Grand Gulf allocation was merely a cover for the determination that the original Grand Gulf investment was unwise").

The Council further argued that the district court's decision to stay was justifiable under *Colorado River* and *Moses H. Cone Memorial Hospital*, despite the failure to consider expressly the relevance of motivation to the pretext claim. We review the decision to stay only for an abuse of discretion. *Moses H. Cone Memorial Hospital*, 460 U.S. at 19, 103 S.Ct. at 938; *Brown v. Link Belt Division of FMC Corp.*, 666 F.2d 110 (5th Cir.1982). Under *Colorado River* and *Moses H. Cone Memorial Hospital*, the district court was required to consider whether the case presented exceptional circumstances, in which considerations of

wise judicial administration—in particular the need to conserve judicial resources and promote comprehensive disposition of litigation—counselled against exercising jurisdiction. *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246. Several factors guide this decision, none of which is necessarily determinative. *Id.* The court was required to consider the convenience of the federal forum, the desirability of avoiding piecemeal litigation, the order in which the federal and state forums obtained jurisdiction and the progress of the litigation in each, whether there existed a *res* over which one forum or both had asserted jurisdiction, which forum's law provided the rule of decision in the case, and the adequacy of the state court proceedings to protect NOPSI's rights. *Colorado River*, 424 U.S. at 819–820, 96 S.Ct. at 1247–1248; *Moses H. Cone Memorial Hospital*, 460 U.S. at 24–27, 103 S.Ct. at 941–943. The court was not to apply these factors as a mechanical checklist, but rather to balance carefully the factors important in the particular setting of the case. It was also to weight the balance heavily in favor of exercising jurisdiction. *Moses H. Cone Memorial Hospital*, 460 U.S. at 16, 103 S.Ct. at 937.

The Council maintained that, as long as there was sufficient evidence to support the Council's stated reasons for denying the pass through, the pretext claim must fail, that there was no difference between the pretext claim and the state law challenges to the order's validity. Since the state trial court had already decided the state law challenges, and thereby already passed, albeit indirectly, on the pretext claim, the Council contended the district court properly concluded that, while federal law technically provided the rule of decision, there were no substantial federal is-

---

**7.** As we will explain, the district court premised its decision to stay in large part upon its conclusion that there were no substantial federal issues remaining in the case, once it had resolved the facial preemption challenge. The district court said that the disposition of the facial challenge "leaves only the question of whether the Council's finding is supported by the evidence." At 997. At oral argument, the parties and the panel proceeded on the assumption that the district court ignored the pretext claim. On

further reflection and examination of the opinion, we cannot conclusively say that is so. It is equally plausible to read the district court's language to mean that the court thought the pretext claim involved only an analysis of the sufficiency of the evidence, a conclusion with which we agree. We can only conclusively say that the district court did not expressly refute the argument that the pretext claim must involve an evaluation of the Council's motivation in making the rate order.

sues remaining in the case, so the court was not compelled to exercise its jurisdiction on that basis. The Council further argued that the district court's order was not otherwise an abuse of discretion.

### A.

In *NOPSI III*, the Court described the pretext claim as follows:

Unlike the facial challenge, [the pretext] claim cannot be resolved on the face of the rate order, because it hinges largely on the plausibility of the Council's finding that NOPSI should have, and could have, diversified its supply portfolio and thereby lowered its average wholesale costs. See n. 2, supra. Analysis of this pretext claim requires an inquiry into industry practice, wholesale rates, and power availability during the relevant time period, an endeavor that demands some level of industry-specific expertise.

109 S.Ct. at 2515. The reference in this language to the earlier footnote provides further guidance. In that footnote, the Court quoted from the prior district court opinion, in which the district court expressed doubts as to the validity of the Council's stated reasons for denying the pass through:

Adverting to the merits, the District Court commented: "[T]he Council faults NOPSI not for buying a 'pig in a poke' but for failing to find a sucker to buy it when the faux pas became apparent."[11]

---

[11] P.T. Barnum once said of suckers: 'There's one born every minute.' This court, however, is not ready to assume there are many, if any, such suckers purchasing electricity in the wholesale market today. Indeed, this court is somewhat mystified by the Council's logic in arriving at the $135 million disallowance in the Rate Order. In the Rate Order, the Council simply concluded that since [NOPSI's President] said so, savings were actually possible. Then, the Council seemingly pulled from thin air a figure of 8% for the prudence disallowance. However, the Council, and in this case, everyone else knows that the 8% figure was not pulled from thin air but represents the difference between FERC's 17% allocation and what NOPSI consistently claims as its relative share of the [Middle South] system [and what the Council advocated unsuccessfully in the FERC proceeding], i.e., 9%. Thus, the disallowed

costs bear no apparent relationship to the savings NOPSI is said to have foregone. [sic] Must not the 'savings' posited as the reason for the disallowance be at least possible in the actual economic market? Furthermore, must not the ultimate disallowance bear some rational relationship to the possible savings which support the disallowance? These questions must be resolved on another day in another court.

109 S.Ct. at 2512, n. 2. This language suggests that the Court meant the pretext claim is inevitably a review of the sufficiency of the evidence to support the Council's stated reasons for denying the pass through. But NOPSI argues the language should be read to require a further inquiry, a determination of the Council members' motivation in making the order, regardless of the evidence. We disagree. We have said that, facially, the Council's order was a valid exercise of its power over retail rates. If there is an adequate basis in the record to support the Council's action, federal courts may not invalidate it on a suspicion that the Council members' motives were improper. See *Fletcher v. Peck*, 6 Cranch. 87, 128–130, 3 L.Ed. 162 (1810); *Arizona v. California*, 283 U.S. 423, 455 n. 7, 51 S.Ct. 522, 526 n. 7, 75 L.Ed. 1154 (1931); *United States v. O'Brien*, 391 U.S. 367, 382–386, 88 S.Ct. 1673, 1681–1684, 20 L.Ed.2d 672 (1968); *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971). Of course, the evaluation of the sufficiency of the evidence must be made with an eye to the circumstances of the case; but beyond that we cannot go. We do not read *NOPSI III* to require otherwise.

Having reached this conclusion, we cannot reverse the district court for failing expressly to consider the relevance of motivation to the pretext claim in deciding to stay its hand. The pretext claim has little functional difference from the state court's sufficiency of the evidence review, and motivation is not relevant. We therefore can reverse only if the district court's order was otherwise an abuse of discretion.

### B.

Not all of the factors set out in *Colorado River* and *Moses H. Cone* are important in every case, and only some are important

here. In this case, the forums are equally convenient,[8] there is no *res*, and the question of the order in which jurisdiction was actually obtained is confusing and largely academic. We have already determined that there are no substantial federal issues remaining in the case. We therefore focus on the factors that are important—the progress of the proceedings in each forum, the adequacy of the state courts to protect NOPSI's rights, and avoiding piecemeal litigation.

The district court was correct that the state proceeding had progressed further than the federal one, since the state trial court had already rendered judgment on the merits of the sufficiency of the evidence claim. The Council's argument that the state trial court's judgment is entitled to res judicata effect is contrary to Louisiana law, see La.Civ.Code Art. 3556(31) (West 1990); but the fact that the state trial court has rendered judgment nonetheless weighs in favor of a stay. There is little to be gained from rehashing the same evidence in another forum.

The state courts are of course quite adequate to protect NOPSI's rights. Indeed, they are more experienced in reviewing retail rate orders than are federal courts. This factor also weighs in favor of a stay.

*Colorado River* was based primarily upon avoiding piecemeal litigation. Colorado had established a comprehensive system for adjudicating water rights, and it was plain that the relevant federal policies in the McCarran Act favored adjudicating water rights in a single, unified proceeding. 424 U.S. at 819–820, 96 S.Ct. at 1247–1248. The Johnson Act just as clearly evidences a federal purpose to facilitate review of state court retail rate orders in unified proceed-

ings, and indeed in unified proceedings in state court. 28 U.S.C. § 1342; *see Gulf Water Benefaction Co. v. Public Utility Commission*, 674 F.2d 462 (5th Cir.1982). We have held the Johnson Act not applicable to these proceedings, because the preemption claim was based on the Federal Power Act as well as the Constitution, *NOPSI I*, 782 F.2d at 1242–1243; but that holding does not diminish the federal interest in state court resolution of challenges to state rate orders. Further, it is plain that all necessary parties are before the state court and all claims can be adjudicated there. *See Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491, 495, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1941). The district court thus properly concluded that the desire to avoid piecemeal litigation counselled in favor of a stay.

The district court's discretion to stay decision pursuant to *Colorado River* is perhaps not as broad as was once thought. Compare *Will v. Calvert Fire Insurance Co.*, 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978) (plurality opinion) and *Moses H. Cone Memorial Hospital*, 460 U.S. at 16–19, 103 S.Ct. at 937–939. The district court of course has broad control over its docket, but that control is limited by the virtually unflagging obligation to exercise its jurisdiction. *See Moses H. Cone Memorial Hospital*, 460 U.S. at 19, 103 S.Ct. at 938. Here, however, three factors counsel strongly in favor of a stay, and there are no substantial federal questions remaining in the case. Under these circumstances, we cannot say the district court abused its discretion.

## IV.

Finding no merit in NOPSI's facial preemption challenge, and that the district

---

8. The district court noted that "[t]he factor of convenience usually refers to ease of access to sources of proof, availability of compulsory process, and enforceability of judgments," and that in this sense, neither forum in this case was more convenient than the other. But the court still found the federal forum inconvenient because "it is certainly inconvenient for the parties to pursue two concurrent, parallel litigations in two courts within the same parish in Louisiana." At 996. This approach unnecessarily confuses the analysis. The Court in *Colorado*

*River* plainly considered convenience to mean roughly what it does in *forum non conveniens* analysis, as its reference to *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) indicates. 424 U.S. at 818, 96 S.Ct. at 1246. The other difficulties of proceeding in parallel forums—waste of judicial resources, duplication of effort, expense—are more properly considered in determining whether it is appropriate to stay in order to avoid piecemeal litigation.

court properly stayed the pretext challenge, we affirm the judgment of the district court.

AFFIRMED.