OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Justine Michael, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

Office of Consumers' Counsel, Appellant, v. Public Utilities Commission of Ohio et al., Appellees.

[Cite as Consumers' Counsel v. Pub. Util. Comm. (1992), Ohio St.3d    .]

Public Utilities Commission -- Natural gas companies --
    Rate increase -- Stipulated expenses in staff report --
    Commission may take stipulations into consideration,
    but must determine what is just and reasonable from
    evidence presented at the hearing -- Commission's order
    affirmed, when.

(No. 91-823 -- Submitted April 7, 1992 -- Decided July 1, 1992.)

Appeal from the Public Utilities Commission of Ohio, No. 90-390-GA-AIR.

Cincinnati Gas & Electric Company ("CG&E"), intervening appellee, an Ohio corporation supplying gas and electric service in Ohio, applied to the Public Utilities Commission of Ohio, appellee, for a permanent gas rate increase on April 2, 1990. The commission staff conducted an investigation into the application and submitted its report. All parties except the Office of Consumers' Counsel ("OCC"), appellant, stipulated that the rate recommendations contained in the staff report be adopted by the commission. The commission adopted these recommendations over OCC's objection and incorporated them into its order.

OCC contests the commission's refusal to account for an alleged shortfall in revenue from two of CG&E's customers, Oxford Natural Gas Company and Union Light, Heat & Power Company, and the commission's inclusion of some expenses in the rate case.

CG&E transports gas for Oxford, an independent natural gas company. According to the commission's May 14, 1986 order approving CG&E's contract with Oxford, CG&E agreed to transport Oxford's gas in CG&E's pipeline for $50,208 annually and $.0363 per Mcf. Under the agreement, the parties may renegotiate the transportation charge once every two years, but the commission must approve any modifications. The parties and the commission term this arrangement as "firm" transportation; firm transportation customers receive gas delivered to the system on

their behalf without interruption.

According to staff witness Eggleton, this transportation charge reflects CG&E's cost of service based on a study conducted by CG&E for, and approved by, the commission in the 1986 order. However, this charge is less than the tariff charge approved by the commission in the instant case for other, normally industrial, customers, of $1.4877 per Mcf. Nevertheless, the commission, per the stipulation, included in CG&E's revenue the revenue calculated on the actual transportation charge to Oxford.

CG&E also transports gas, interstate, for Union, CG&E's affiliated natural gas company. Union operates in Kentucky. Consequently, the Federal Energy Regulatory Commission ("FERC") set the rate for this service. Under FERC's order, CG&E collects the same amount it collects from Oxford, $.0363 per Mcf, but does not receive any additional fee because this service is interruptible; that is, CG&E may curtail deliveries during peak periods of pipeline usage.

The staff recommended that the amount received from Union be increased by a $202,000 credit and, as increased, included in rate-case revenue. This credit accounts for the larger rate that Union charges CG&E for reciprocal transportation services.

OCC, on the other hand, maintains that additional revenue credits, equaling what these two customers would pay if CG&E had charged them at the tariff rate, should also be included in revenue. OCC would increase the total revenue credit for Union from $171,063 to $3,107,000 and for Oxford from $89,248 to $940,494; this increase in revenue would lower general rates.

The commission concluded that the staff's recommendations reasonably treated the actual revenue received from these two customers. It also found that OCC's proposals were not supported by any evidence such as a cost of service study or a consideration of the impact on CG&E's business if it were to raise its rates. In support of this conclusion, the commission noted that Oxford had once threatened to bypass CG&E's pipeline and build its own pipeline, which would reduce CG&E's revenue, and that FERC regulates the rate that CG&E receives from Union, over which CG&E has no control.

OCC also objected to the inclusion of some expenses, to which the other parties had stipulated. OCC challenges employee service awards paid to employees based on length of service with CG&E; chamber of commerce dues; advertising expenses to promote CG&E's Heatshare program, and other expenses allegedly related to nondeductible advertising expenses; and the calculation of pension, advertising, and injuries and damages expenses.

This matter is before the court upon an appeal as of right.

William A. Spratley, Consumers' Counsel, Evelyn R. Robinson-McGriff, Richard W. Pace, Sr., and Thomas C. Kawalec, for appellant.

Lee I. Fisher, Attorney General, James B. Gainer and Anne L. Hammerstein, for appellee.

Squire, Sanders & Dempsey, Alan P. Buchmann, David H. Wallace and Debra J. Horn, for intervening appellee.

Per Curiam.

## A
### Stipulation

OCC contends that the evidence does not support the stipulation and that any stipulation not supported by substantial evidence is unlawful. The commission and CG&E maintain that sufficient evidence supports the stipulation and, consequently, the commission's order.

In Akron v. Pub. Util. Comm. (1978), 55 Ohio St.2d 155, 157, 9 O.O.3d 122, 123, 378 N.E.2d 480, 483, in which the city-appellants had stipulated to the staff-determined rate base but not the cost of capital or the rate of return, we stated:

"The commission, of course, is not bound to the terms of any stipulation; however, such terms are properly accorded substantial weight. Likewise, the commission is not bound by the findings of its staff. Nevertheless, those findings are the result of detailed investigations and are entitled to careful consideration."

In Duff v. Pub. Util. Comm. (1978), 56 Ohio St.2d 367, 379, 10 O.O.3d 493, 499, 384 N.E.2d 264, 273, in which several of the appellants challenged the correctness of a stipulation, we stated:

"A stipulation entered into by the parties present at a commission hearing is merely a recommendation made to the commission and is in no sense legally binding upon the commission. The commission may take the stipulation into consideration, but must determine what is just and reasonable from the evidence presented at the hearing. * * *"

Thus, the commission may place substantial weight on the terms of a stipulation, even though the stipulation does not bind the commission. In any event, the commission must determine, from the evidence, what is just and reasonable, and an appellant, to succeed, must show that the commission's order was against the manifest weight of the evidence. Consequently, we will review the evidence and the commission's treatment of it in light of the stipulation.

Moreover, the commission, here, determined that the stipulation did not violate its previously adopted criteria regarding settlements:

1. Is the settlement a product of serious bargaining among capable, knowledgeable parties?

2. Does the settlement, as a package, benefit ratepayers and the public interest?

3. Does the settlement package violate any important regulatory principle or practice?

The commission found that (1) the signatories had proven their ability to grasp and resolve complex utilities issues; (2) CG&E will earn, in a time and money saving process, a fair return within the commission's target range while residential ratepayers will pay rates below the jurisdictional average; and (3) the settlement does not violate any important regulatory principle or practice, despite OCC's objections. We endorse the commission's effort utilizing these criteria to resolve its cases in a method economical to ratepayers and public utilities.

## B
### Oxford and Union Transportation Charges

OCC argues that the commission failed to augment revenue based on a charge commensurate with CG&E's costs to provide transportation services to Oxford and Union and that, consequently, the ratepayers bear the burden of the lower revenue produced by these lower charges via higher rates. Instead, OCC argues, CG&E's shareholders should bear this burden. The commission and CG&E contend that CG&E has no control over the amounts received from Oxford and Union and that revenue calculated on the actual rates charged, with a minor credit to account for the noted rate imbalance in the Union transaction, should be included in revenue. According to them, the commission based its finding on sufficient, probative evidence.

The agreement between CG&E and Oxford, which established the transportation rate between them, is authorized under R.C. 4905.31. It is a special, negotiated agreement and does not fall within the rate-setting procedure of R.C. 4909.15. Industrial Energy Consumers v. Pub. Util. Comm. (1991), 62 Ohio St.3d 440, 584 N.E.2d 653.

In Canton v. Pub. Util. Comm. (1980), 63 Ohio St.2d 76, 17 O.O.3d 46, 407 N.E.3d 9, we faced a situation similar to the one at hand. There, Ohio Power Company had previously sought to cancel special contracts it had with the Kaiser Aluminum & Chemical Corporation and the Ormet Corporation. Ohio Power had maintained that the Kaiser and Ormet contracts created an undue burden on other customers and were discriminatory. However, the commission, in this earlier case, decided the contracts assigned expenses to Kaiser and Ormet based on cost causation, and, since the contractual costs to those customers increased on a periodic basis, the agreements did not unduly burden the tariff customers. The commission had further concluded that the special needs of Kaiser and Ormet served as a basis for the provisions of the contracts between them and Ohio Power and that this provided reasons to differentiate them from tariff customers. After the commission dismissed that complaint, Ohio Power filed an application for a rate increase for jurisdictional customers, which was the subject of Canton.

Appellants in Canton challenged the allocation of property and expenses used by Ohio Power in serving Kaiser and Ormet. The commission was required to allocate to remove property and expenses not employed in serving the jurisdictional ratepayers from Ohio Power's rate base. Appellants challenged this allocation, charging that it shifted the cost of service attributable to Kaiser and Ormet to Ohio Power's remaining ratepayers. After reviewing the competing evidence, we concluded that the allocation procedure did not violate the applicable statutes. We considered the question to be an evidentiary one and refused to review a finding of the commission de novo. We cited Masury Water Co. v. Pub. Util. Comm. (1979), 58 Ohio St.2d 147, 148-149, 12 O.O.3d 163, 164, 389 N.E.2d 478, 480-481, which stated:

"Where conflicting evidence is presented to the commission with regard to a matter at issue, the commission's determination will not be disturbed unless the party who challenges that finding demonstrates that it is manifestly against the weight of the evidence and so clearly unsupported by the record in the cause as to demonstrate misapprehension,

mistake, or willful disregard of duty."

OCC fails in this burden because it did not effectively controvert the commission's reasoning. The commission concluded that the revenue realizable from Oxford equaled the negotiated amount. The record supports this. The commission approved the negotiated rate after it studied CG&E's cost to serve Oxford. Thus, the rate has a cost basis. Moreover, Oxford, an independent utility, could, as it threatened, build its own pipeline and transport its own gas, eliminating this revenue source. Consequently, the commission's decision on this revenue has record support.

As to Union, FERC set the rate that CG&E could charge Union. Under Nantahala Power & Light Co. v. Thornburg (1986), 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943, such rate decision preempts the commission's authority. While under New Orleans Public Service, Inc. v. Council of New Orleans (1989), 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298, and (C.A. 5, 1990), 911 F.2d 993, the commission could question CG&E's wisdom in continuing in business with Union, the commission did not. Furthermore, the lower quality, interruptible service justifies a lower rate. Thus, the record supports the commission's decision on the Union contract.

Nevertheless, if OCC presents opposing evidence, the evidence should be "* * * credible, authoritative and challenging." Akron v. Pub. Util. Comm. (1966), 5 Ohio St.2d 237, 243, 34 O.O.2d 467, 470-471, 215 N.E.2d 366, 371. OCC did not present a cost of service study or any other evidence to establish that CG&E's cost to transport Oxford's and Union's gas was other than that which the commission determined. OCC's witness speculates that the tariff charged other customers, which was based on a cost of service study, equals the cost to transport Oxford's and Union's gas and is the correct charge to be attributed to CG&E for these transportation services. This speculation, however, does not sustain OCC's burden.

C

Expenses

OCC's general thesis in objecting to the inclusion of certain expenses in the rate case is that the commission departed from its precedent without justification. The commission and CG&E disagree with OCC.

According to Cleveland Elec. Illum. Co. v. Pub. Util. Comm. (1975), 42 Ohio St.2d 403, 431, 71 O.O.2d 393, 409, 330 N.E.2d 1, 19-20:

"Although the Commission should be willing to change its position when the need therefor is clear and it is shown that prior decisions are in error, it should also respect its own precedents in its decisions to assure the predictability which is essential in all areas of the law, including administrative law."

1. Service awards. CG&E rewarded its employees financially based on length of service. The commission allowed this expense, and OCC claims that this action is contrary to how it treated the same expenses in In re Application of Ohio-American Water Co. (Dec. 7, 1988), P.U.C.O. Nos. 87-2153-WW-AIR and 88-379-WW-AAM.

As the commission points out, in Ohio American Water the commission rejected that portion of the expense item relating

to appreciation dinners and Christmas gift boxes.  It allowed expenses for awards given to employees for safety achievements or length of service.  Thus, the commission's decision here does not contradict its precedent.  Moreover, the commission explained that these awards based on length of service are a cost effective way to motivate and compensate employees.  This explanation satisfies Cleveland Elec. Illum. Co.

2.  Chamber of commerce dues.  OCC contends that, since 1979, the commission has disallowed these expenses.  However, the commission noted that it had taken irreconcilable positions on these expenses in earlier cases and decided to resolve this question in the instant case.  It distinguished social/service club memberships, which provide for charitable functions, from corporate chamber of commerce membership, which provides for interaction with the business community and promotes development within the community.  The commission concluded that this latter expense inures to the benefit of ratepayers and included it as an ordinary and necessary business expense.  This conclusion is reasonable.

3.  Advertising expenses.  OCC challenges advertising expenses to promote CG&E's Heatshare program.  In this program, CG&E matched, one dollar for two dollars to a maximum of $75,000 per year, its customers' contributions to a fund which paid for the utility bills of qualified applicants.  The challenged expenses were limited to the advertising expenses incurred to inform CG&E's customers about the program and how to participate in it; they were not CG&E's contribution to the program.

Although OCC charges that the commission departed from precedent in allowing these expenses, it fails to cite any persuasive precedent.  Essentially it contends that the charges should be excluded under Cleveland v. Pub. Util. Comm. (1980), 63 Ohio St.2d 62, 17 O.O.3d 37, 406 N.E.2d 1370, syllabus.

Under that case, a utility may not deduct institutional or promotional advertising but may deduct consumer/informational or conservational advertising.  Here, the commission decided that the instant expenses were consumer or informational because they informed the consumer of an available program to obtain payment of his bills, which also spared other ratepayers from reimbursing, via rate increases, CG&E for its inability to collect unpaid bills.  Under Cleveland, this decision is reasonable because the advertising is "'designed to inform the consumer of rates, charges and conditions of service, of benefits and savings available to the consumer * * *[.]'"  63 Ohio St.2d at 70, 17 O.O.3d at 43, 406 N.E.2d at 1377.

4.  Salaries, equipment, and other expenses.  Here, OCC claims that these expenses are directly related to already excluded demonstration and selling expenses, customer service and informational expenses, and administrative and general expenses.  However, the commission, agreeing with its staff and CG&E, found that these items were fixed costs that CG&E would incur even if the disapproved activities ceased.  Indeed, the disputed personnel evidently worked throughout several tiers of management.  This conclusion is reasonable; moreover, OCC fails to present any compelling precedent.

5.  Pension, advertising, and injuries and damages expenses.  The commission, adopting the staff's procedure,

calculated these expenses based on three months of actual expenses and nine months of estimated expenses. On the other hand, OCC, having been provided with nine months of actual expenses by CG&E at the time of the hearing, calculated the expenses on nine months of actual expenses and three months of estimated expenses. However, OCC selected only one sub-account of the employee pensions and benefits account. Had OCC updated the entire account according to its strategy, CG&E's expenses for the entire account would have actually increased by $4,000.

Furthermore, the commission rejected OCC's contention for the injuries and damages expenses because their incurrence was erratic in nature, depending on the timing of the claims against the company, and because OCC's position was no more representative.

Finally, as to the advertising expenses, CG&E explained that the lower actual expenses were caused by CG&E's change in advertising agencies and a reorganization of CG&E's marketing department. The commission concluded that this was an unrepresentative circumstance and did not warrant an expense deduction based on it. All these explanations are reasonable.

Accordingly, we affirm the commission's order as it is neither unlawful nor unreasonable.

Order affirmed.

Moyer, C.J., Sweeney, Holmes, Douglas, Wright, H. Brown and Resnick, JJ., concur.